**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; EARTH ISLAND INSTITUTE, *Plaintiffs-Appellants*, <br><br> v. <br><br> ELI ILANO; THOMAS TIDWELL; UNITED STATES FOREST SERVICE, *Defendants-Appellees*, <br><br> SIERRA PACIFIC INDUSTRIES, *Intervenor-Defendant-Appellee.* | No. 17-16760 <br><br> D.C. No. 2:16-cv-02322-VC <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Vince Chhabria, District Judge, Presiding

Argued and Submitted December 18, 2018
San Francisco, California

Filed June 24, 2019

Before:  Milan D. Smith, Jr. and Jacqueline H. Nguyen,
Circuit Judges, and Jane A. Restani,[*] Judge.

Opinion by Judge Nguyen

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of the U.S. Forest Service in an action challenging the Forest Service's designation of at-risk forest lands and its approval of the Sunny South Project, which aimed to address spreading pine-beetle infestation in previously designated at-risk areas within the Tahoe National Forest.

In 2014, Congress amended the Healthy Forests Restoration Act ("HFRA") to allow the Forest Service greater flexibility in managing the health of forest lands threatened by insect and disease infestation.  Large areas of forest land that face a heightened risk of harms are designated as "landscape-scale areas." 16 U.S.C. §§ 6591a, 6591b.

The panel held that the Forest Service's designation of 5.3 million acres as a landscape-scale area in the Tahoe

---

[*] The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

National Forest in California did not violate the National Environmental Policy Act ("NEPA"). Specifically, the panel held that here the designation of landscape-scale areas under HFRA did not change the status quo, and did not trigger a NEPA analysis. The panel further held that *California Wilderness Coalition v. United States Department of Energy*, 631 F.3d 1072 (9th Cir. 2011), did not compel a contrary result. The panel concluded that the Forest Service's designation of landscape-scale areas did not require an environmental assessment or environmental impact statement under NEPA.

Plaintiffs challenged the Forest Service's conclusion that no extraordinary circumstances existed and that the Sunny South Project was categorically excluded from NEPA compliance because the project's potential impact on the California spotted owl constituted extraordinary circumstances. The panel held that the Forest Service considered relevant scientific data, engaged in a careful analysis, and reached its conclusion based on evidence supported by the record. The panel concluded that the Forest Service's decision was not arbitrary or capricious.

## COUNSEL

Justin Augustine (argued), Oakland, California; René P. Voss, San Anselmo, California; for Plaintiffs-Appellants.

Barclay T. Samford (argued) and J. David Gunter II, Attorneys; Eric Grant, Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Denver, Colorado; for Defendants-Appellees.

Lawson E. Fite (argued) and Sara Ghafouri, American Forest Resource Council, Portland, Oregon, for Intervenor-Defendant-Appellee.

**OPINION**

NGUYEN, Circuit Judge:

In 2014, Congress amended the Healthy Forests Restoration Act ("HFRA") to allow the United States Forest Service greater flexibility in managing the health of forest lands threatened by insect and disease infestation. The Forest Service identified large swaths of lands in California, including lands within the Tahoe National Forest, as insect-infested and diseased areas under the HFRA. In 2016, the Forest Service approved the Sunny South Project, which aimed to address spreading pine-beetle infestation in previously designated at-risk areas within the Tahoe National Forest.

Two environmental groups, the Center for Biological Diversity and Earth Island Institute, filed suit, challenging both the Forest Service's designation of at-risk forest lands and its approval of the Sunny South Project on the ground that the agency's actions violated the National Environmental Policy Act ("NEPA"). The district court granted summary judgment in favor of the Forest Service. We affirm.

# I.

# BACKGROUND

## A.  National Environmental Policy Act

"NEPA mandates the preparation of an [environmental impact statement ('EIS')] for 'every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment.'"  *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1062 (9th Cir. 1998) (quoting 42 U.S.C. § 4332(C)).  The federal agency concerned must "prepare an [environmental assessment ('EA')] to determine whether a proposed federal action will have a significant impact and to determine whether preparation of an EIS will be necessary." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238–39 (9th Cir. 2005).  Under NEPA, agencies must take a "'hard look' at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  NEPA "does not mandate particular results, but simply prescribes the necessary process."  *Id.* Some actions, however, are categorically excepted or excluded from NEPA's procedural requirements.  *See, e.g.*, *Douglas County v. Babbitt*, 48 F.3d 1495, 1502 n.7 (9th Cir. 1995) (referencing categorical exceptions from NEPA compliance for actions under the Clean Air Act and permits under the Marine Mammal Protection Act).

## B.  Healthy Forests Restoration Act

Congress amended the HFRA as part of the 2014 Farm Bill.  *See* H.R. Rep. No. 113-333, at 512 (2014) (conf. report); Agricultural Act of 2014, Pub. L. No. 113-79, § 8204, 128 Stat. 649, 915–18; S. Rep. No. 113-88, at 18

(2013).   The purpose of the HFRA amendments was to address "[t]he outbreak of the pine bark beetle afflicting states across the nation," which was "creating potentially hazardous fuel loads in several western states."  H.R. Rep. No. 113-333, at 512; *see* Agricultural Act of 2014 § 8204, 128 Stat. 649, 915–18.   Prior to these amendments, the "system for managing national forests affected by historic insect infestations ha[d] not been responsive to the speed and widespread impact of the infestations."  H.R. Rep. No. 113-333, at 512.  The amendments were intended "to give forest managers greater opportunity to identify and manage risk in the forest."  S. Rep. No. 113-88, at 18.  In furtherance of this objective, the amendments created a two-step process to combat insect infestations and diseased forests.    *See* 16 U.S.C. §§ 6591a, 6591b.

Under the first step, large areas of forest land that face a heightened risk of harms from infestation and disease are designated as "landscape-scale areas."  *Id.* § 6591a.  Within 60 days after the enactment of the amendments, upon request by the governor of a state experiencing an insect or disease epidemic, the Secretary of Agriculture must designate one or more treatment areas in affected national forests in the state. *Id.* § 6591a(b)(1).[1]  After those 60 days, "the Secretary may designate additional landscape-scale areas . . . as needed to address insect or disease threats."  *Id.* § 6591a(b)(2).

Regardless of whether the area is designated as an "initial area" under subsection (b)(1) or an "additional area" under subsection (b)(2), the same requirements apply: An area can be designated as a landscape-scale area only if it

---

[1] The Secretary delegated authority to designate landscape-scale areas to the Chief of the Forest Service.

falls into one of three categories.  *See id.* § 6591a(c).  To be designated as a landscape-scale area, the area must be:

> (1) experiencing declining forest health, based on annual forest health surveys conducted by the Secretary;

> (2) at risk of experiencing substantially increased tree mortality over the next 15 years due to insect or disease infestation, based on the most recent National Insect and Disease Risk Map published by the Forest Service; or

> (3) in an area in which the risk of hazard trees poses an imminent risk to public infrastructure, health, or safety.

*Id.*

Under the second step of the two-step process, treatment projects are created and implemented to combat issues faced in the landscape-scale areas.  *See id.* § 6591b.  Projects under this second step "may be . . . categorically excluded from the requirements of [NEPA]."  *Id.* § 6591b(a)(1).

Two months after the HFRA amendments were enacted, the Forest Service issued a two-page white paper addressing the applicability of NEPA to the designation of landscape-scale areas under 16 U.S.C. § 6591a (section 602 of the HFRA).  The Forest Service concluded that because the designation of landscape-scale areas does not directly or indirectly affect the environment, there are no effects that can be meaningfully evaluated, and a NEPA analysis is not required at the designation stage.

**C. Designation of Landscape-Scale Areas and Development and Approval of the Sunny South Project**

In 2014, at the request of California's governor, the Chief of the Forest Service designated 1.5 million acres of land as a landscape-scale area under § 6591a(b)(1). And in 2015, the Chief designated an additional 5.3 million acres of lands in California, which encompassed the Tahoe National Forest, as a landscape-scale area under § 6591a(b)(2). The Chief designated these additional areas because they met one or more of the following criteria: they were "experiencing declining forest health," were "at risk of substantially increased tree mortality," or were areas "in which the risk of hazard trees poses an imminent risk to public infrastructure, health, or safety." *See* 16 U.S.C. § 6591a.

In the fall of 2015, the Forest Service initiated planning for the Sunny South Project. The project authorizes tree thinning and prescribed burning across 2,700 acres of the Tahoe National Forest. The project addresses the "perfect storm for an outbreak of bark beetles" caused by "four years of drought causing moisture stress in the trees and dense stands of almost pure ponderosa pine in sizes attractive to the bark beetle." Its stated objective is to "give the remaining green trees access to more water and nutrients, leading to improved vigor to overcome the insect infestation." The project was designed to "have positive . . . effects on wildfire control operations."

In 2016, biologists completed an evaluation to assess the Sunny South Project's "potential effects and determine whether [it] would result in a trend toward listing or loss of viability for sensitive species." In preparing the evaluation, the biologists made "a conscientious attempt . . . to review and draw from the best available science regarding species,

their associated habitat needs, and the potential for adverse project-related effects." As part of that evaluation, the biologists examined the project's potential effect on the California spotted owl, which the Forest Service designated as a sensitive species in the Tahoe National Forest. Ultimately, the biologists concluded that the Sunny South Project "may affect individuals, but is not likely to result in a trend toward federal listing or loss of viability for the California spotted owl."

The Forest Service approved the Sunny South Project in a decision memo dated August 3, 2016. In the memo, the Forest Service concluded that the project was categorically excluded from NEPA analysis under the HFRA, as there were no extraordinary circumstances preventing the application of the categorical exclusion from NEPA.

**D. Procedural History**

The Center for Biological Diversity and Earth Island Institute filed suit, alleging that the Forest Service violated NEPA when it designated the 5.3 million acres in California under § 6591a(b) without first preparing an EA or EIS. Plaintiffs also alleged that the Forest Service violated NEPA when it invoked the categorical exclusion in § 6591b for the Sunny South Project. The district court granted summary judgment in favor of the Forest Service[2] and Defendant-Intervenor Sierra Pacific Industries. Plaintiffs timely appealed.

---

[2] The Supervisor of the Tahoe National Forest, Eli Ilano, and the Chief of the United States Forest Service, Tony Tooke, are also Defendants-Appellees in this action.

## II.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. "We review a district court's grant of summary judgment on NEPA claims *de novo*." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1123 (9th Cir. 2012).

Compliance with NEPA is reviewed under the Administrative Procedures Act ("APA"). *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012). "Under the APA, a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc)).

## III.

## DISCUSSION

### A. Landscape-Scale Area Designation under § 6591a(b)(2) Does Not Trigger a Requirement for NEPA Analysis

Plaintiffs argue that the Forest Service's designation of 5.3 million acres as a landscape-scale area violated NEPA because no EA or EIS was prepared.

Under NEPA, federal agencies must prepare an EIS for major federal actions that "have a significant environmental impact." *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998). "An EIS is not necessary where a proposed federal action would not change the status quo."

*Id.* That is because "[l]ong-range aims are quite different from concrete plans," and "NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project." *Id.*

Here, the designation of landscape-scale areas does not "change the status quo." Designating landscape-scale areas does not mark the commencement of any particular projects; it only identifies swaths of land suffering from the harms of insect or disease infestation where certain priority projects *may* be implemented. *See* 16 U.S.C. § 6591a(d)(1). As the Supreme Court explained, where "it is impossible to predict the level of . . . activity that will occur in the region," it is "impossible to analyze the environmental consequences and the resource commitments involved in, and the alternatives to, such activity." *Kleppe*, 427 U.S. at 402. In such circumstances, "any attempt to produce an [EIS] would be little more than a study . . . containing estimates of potential development and attendant environmental consequences." *Id.* In other words, unless there is a particular project that "define[s] fairly precisely the scope and limits of the proposed development of the region," there can be "no factual predicate for the production of an [EIS] of the type envisioned by NEPA." *Id.* Therefore, we hold that the designation of landscape-scale areas under the HFRA does not trigger a NEPA analysis.

To conclude otherwise would undercut Congress's intent in amending the HFRA, which was to address "the speed and widespread impact of [insect] infestations." H.R. Rep. No. 113-333, at 512. Areas that qualify for designation under § 6591a are those already at risk from "declining forest health," "increased tree mortality," or those "in which the risk of hazard trees poses an imminent risk to public

infrastructure, health, or safety."  16 U.S.C. § 6591a(c)(1)–
(3).    Given  the  imminence  of  these  "threats,"  *id.*
§ 6591a(b)(2), Congress plainly intended to allow the Forest
Service flexibility to combat them quickly.

Congress's  sense  of  urgency  is  reflected  in  other
components of § 6591a.  For example, the statute requires
that an initial area be designated within 60 days of its
enactment, at the request of a state governor.    *Id.*
§ 6591a(b)(1).  Projects in the designated areas are "priority
projects."    *Id.* § 6591a(d)(1).    Reading a NEPA analysis
requirement into the HFRA with respect to landscape-scale
area designations would conflict with the statute's overall
purpose of expediting the response to declining forest lands.

Plaintiffs argue that *California Wilderness Coalition v.
United States Department of Energy*, 631 F.3d 1072 (9th Cir.
2011), compels a contrary result.  It does not.  In *California
Wilderness  Coalition*, we concluded that a NEPA analysis
was  required  when  the  Department  of  Energy  ("DOE")
designated  certain  areas  as  national  interest  electric
transmission corridors ("NIETCs"), thereby permitting "a
fast-track approval process" for "utilities seeking permits for
transmission lines within the corridor."  *Id.* at 1080, 1096–
1106.  But the statute there explicitly called for compliance
with environmental laws, including NEPA, unless otherwise
specifically exempted.  *See* 16 U.S.C. § 824p(j)(1).  Such a
provision is conspicuously absent in the relevant provisions
of the HFRA.  *See* 16 U.S.C. § 6591a.

Moreover,  unlike  the  designation  of  landscape-scale
areas under the HFRA, the designation of NIETCs changes
the status quo. *See Cal. Wilderness Coal.*, 631 F.3d at 1103.
Designation of NIETCs "create[s] new federal rights,
including the power of eminent domain."  *Id.* at 1101.  The
designation of NIETCs also encourages, through incentives

to utility companies, "the siting of transmission facilities in one municipality rather than another." *Id.* at 1103. This "has effects in both municipalities in terms of the . . . proposed and potential uses of land." *Id.* A NIETC designation thus makes it entirely foreseeable that the land in question will be used for electrical power transmission and enables federal agencies to evaluate the attendant environmental consequences.

A landscape-scale area designation, in contrast, does not alter future land use or otherwise foreseeably impact the environment. Plaintiffs would have the Forest Service "consider the environmental effects that speculative or hypothetical projects might have," which "NEPA does not require." *Northcoast Envtl. Ctr.*, 136 F.3d at 668. We therefore hold that the Forest Service's designation of landscape-scale areas does not require an EIS or EA under NEPA.

## B. The Forest Service's Finding that the Sunny South Project Did Not Involve "Extraordinary Circumstances" Was Not Arbitrary or Capricious

Certain agency actions are categorically excluded from NEPA. *See, e.g.*, 16 U.S.C. § 6591b(a). In some instances, before an agency takes action pursuant to a categorical exclusion, the agency must assess whether that action presents "extraordinary circumstances in which a normally excluded action may have a significant environmental effect," necessitating further environmental impact analysis. 40 C.F.R. § 1508.4. Under the HFRA, a priority project within a designated landscape-scale area may be categorically excluded from NEPA if the project meets certain requirements pertaining to its location, size, purpose, development, and implementation. *See* 16 U.S.C. § 6591b(a)–(d). Here, the Forest Service concluded that no

extraordinary circumstances existed and that the Sunny South Project was categorically excluded from NEPA compliance.[3]    Plaintiffs challenge the Forest Service's finding on the ground that the project's potential impact on the California spotted owl constitutes extraordinary circumstances and that, at a minimum, the Forest Service should have at least conducted an EA before moving forward with the project.

When conducting an extraordinary circumstances inquiry, the agency must first determine whether the proposed action involves certain natural resources present in the area, such as threatened, endangered, or sensitive species. 36 C.F.R. § 220.6(b)(1). If any of the enumerated natural resources are present, then the agency must examine whether there is a "cause-effect relationship between a proposed action and the potential effect on" the resource, and "if such a relationship exists," it is "the degree of the potential effect of a proposed action on" the resource "that determines whether extraordinary circumstances exist." *Id.* § 220.6(b)(2). If the agency "determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," the agency must "prepare an EA." *Id.* § 220.6(c). If "the proposed action may have a significant environmental effect," the agency must "prepare an EIS." *Id.* If there are no extraordinary circumstances, then the agency can invoke the categorical exclusion from NEPA compliance. *See id.* § 220.6(a); *cf. Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,

---

[3] The Forest Service takes the position that it need not engage in an extraordinary circumstances analysis at all. We need not address this issue because the Forest Service did conduct such an analysis, and its decision that the project was categorically excluded from NEPA compliance was not arbitrary or capricious.

100 F.3d 1443, 1450 (9th Cir. 1996) ("[T]he Ninth Circuit has held that an agency may issue a categorical exclusion even where threatened or endangered species are present if the agency determines that the project will not impact negatively on the species.").

Plaintiffs argue that because the project proposes "a medium-intensity logging method . . . that greatly reduces the canopy cover of the logged forest, from as high as 86% canopy cover down to just 50%," it will likely negatively affect the California spotted owl species.  Plaintiffs cite a study that concluded "that reducing canopy cover below 70% has been found to be a serious issue for owls . . . because it can 'reduce reproductive potential, and reduce survival and territory occupancy as well.'"  These potential effects, according to Plaintiffs, are of great significance because the population at large is already declining, and the particular populations in impacted areas "have recently shown the highest productivity possible with regard to owl reproduction."

The Forest Service identified the California spotted owl as a sensitive species within the project area and examined whether the project had any significant environmental effects on the species.  Ultimately, it acknowledged that the project "may affect individual owls, but is not likely to result in a trend toward federal listing or a loss of viability" for the species as a whole.

The record demonstrates that when developing the project, the Forest Service endeavored to ensure that the project did not affect the most important areas of the owls' habitat.  The project avoided the Protected Activity Centers ("PACs")—the most valuable owl habitat, which contains the owls' nesting trees.  And while areas surrounding PACs, known as Home Range Core Areas ("HRCAs"), would be

treated, the project left about 79 percent of these HRCAs untouched. The Forest Service acknowledged that treatment would "reduce habitat suitability by reducing canopy cover to a minimum of 50 percent, but [it] would retain other important components, notably the largest trees, snags, and logs, and untreated stream corridors." Ultimately, the Forest Service concluded that the spotted owl would in fact benefit in the long run because "[b]y protecting active territories and treating the surrounding forest, the project is expected to limit adverse short-term effects while improving long-term habitat" and "reducing the risk of losing suitable habitat."

In finding that individual owls may be negatively impacted in the short-term but the species would benefit in the long-run, the Forest Service relied upon scientific studies and its own expert judgment, to which we must defer. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012) ("We . . . defer to agency decisions so long as those conclusions are supported by studies '*that the agency deems reliable.*'" (quoting *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011))). Plaintiffs cite a different study, but "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Plaintiffs take issue with the Forest Service's conclusion. We conclude, however, that the Forest Service considered relevant scientific data, engaged in a careful analysis, and reached its conclusion based on evidence supported by the record. Therefore, its decision was not arbitrary or capricious.

**AFFIRMED.**