**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 12, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WILD WATERSHED; MULTIPLE
CHEMICAL SENSITIVITIES TASK
FORCE; DR. ANN MCCAMPBELL,
M.D.; JAN BOYER,

        Plaintiffs-Appellants,

v.

SANFORD HURLOCKER, District
Ranger, Santa Fe National Forest;
JAMES MELONAS, Supervisor, Santa
Fe National Forest; CAL JOYNER,
Southwest Regional Forester, U.S.
Forest Service; and VICTORIA
CHRISTIANSEN, Chief of the U.S.
Forest Service, an agency of the U.S.
Dept. of Agriculture,

        Defendants-Appellees.

No. 19-2106

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:18-CV-00486-JAP-SCY)**

---

Thomas J. Woodbury, Forest Defense, P.C., Missoula, Montana, for Appellants.

Eric Grant, Deputy Assistant Attorney General, Environment and National
Resources Division, U.S. Department of Justice (Andrew C. Mergen and Andrew
A. Smith, Attorneys, Environment and National Resources Division, U.S.
Department of Justice, and Stephen A. Vaden, General Counsel and Dawn
Dickman, Attorney, Office of General Counsel, U.S. Department of Agriculture,
with him on the brief), Washington, D.C., for Appellees.

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **HARTZ**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

The United States Forest Service approved two forest thinning projects in the Santa Fe National Forest pursuant to statutory authority granted by a 2014 amendment to the Healthy Forests Restoration Act (HFRA). By thinning the forest and then conducting prescribed burns in the project areas, the Forest Service aimed to reduce the risk of high-intensity wildfires and tree mortality related to insects and disease. Certain environmental organizations and individuals (collectively Wild Watershed) challenged the projects' approval under the Administrative Procedure Act (APA). They assert the Forest Service[1] failed to comply with the National Environmental Policy Act (NEPA) and HFRA. The district court rejected these claims.

We similarly find the Forest Service complied with its obligations under NEPA and HFRA when it approved the projects. The Forest Service adequately considered the projects' cumulative impacts as well as their potential effects on sensitive species in the area and the development of old growth forest. We therefore AFFIRM.

---

[1] Appellees are employees of the Santa Fe National Forest and United States Forest Service whom Wild Watershed sued in their official capacities only.

# I. Background

### *A. Statutory and Regulatory Frameworks*

#### *1. National Environmental Policy Act*

NEPA requires federal agencies to analyze environmental consequences before initiating actions that potentially affect the environment. The Act has two broad aims. First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010). Second, it ensures "that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* NEPA does not mandate any particular substantive result. Instead, it "prescribes the necessary process" that must accompany agency action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

One of the hallmarks of NEPA is that agencies must prepare an environmental impact statement (EIS) when a proposed project will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS "involves the most rigorous analysis" that an agency may be required to perform. *See Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006). NEPA's implementing regulations establish a tiered framework for agencies to consider in

deciding whether an EIS is necessary.[2]  The regulations contemplate three categories into which a proposed project might fall.  First, the action may be of the type that is generally so significant that it "[n]ormally requires an environmental impact statement."  40 C.F.R. § 1501.4(a)(1).  Next, the action may be of uncertain significance, in which case the agency will prepare an environmental assessment (EA)—a more concise document designed to determine whether a full EIS is necessary.  40 C.F.R. § 1501.4(b)–(c).  Finally, the action may be categorically excluded, meaning it normally does not require either an EA or an EIS.  40 C.F.R. § 1501.4(a)(2).

Categorical exclusions come in one of two varieties: those established by regulations and those established by statutes.  Implementing regulations define *regulatory* categorical exclusions as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required."  40 C.F.R. § 1508.4.

_____

[2]  The Council on Environmental Quality is responsible for implementing NEPA's requirements by promulgating binding regulations.  *See* 42 U.S.C. §§ 4342, 4344(3); 40 C.F.R. §§ 1501–08.  Agencies such as the Forest Service comply with the Council's regulations by adopting supplemental procedures.  *See, e.g.*, 36 C.F.R. § 220.1 *et seq*.

Although regulatory categorical exclusions generally do not require an EA or an EIS, implementing regulations provide that where "extraordinary circumstances" exist such that "a normally excluded action may have a significant environmental effect," the agency must engage in one of the more thorough forms of review before proceeding. *See* 40 C.F.R. § 1508.4; 36 C.F.R. § 220.6(b). Thus, when relying on a regulatory categorical exclusion, the Forest Service performs minimal procedures to assess whether such extraordinary circumstances exist. 36 C.F.R. § 220.6(b). We refer to these procedures as extraordinary circumstances review.[3]

In addition to regulatory categorical exclusions, Congress has intervened to establish certain *statutory* categorical exclusions. *See, e.g.*, 16 U.S.C. § 6591b. Many of these, including the provision at issue in this appeal, are codified in HFRA.

---

[3]  In conducting extraordinary circumstances review, the Forest Service considers the existence of certain "[r]esource conditions," in the project area, including "[i]nventoried roadless area[s]," "potential wilderness area[s]," and "Forest Service sensitive species." 36 C.F.R. § 220.6(b)(1). The mere presence of resource conditions does not preclude the agency relying on a categorical exclusion. Instead, it is the "degree of the potential effect of a proposed action on the[] resource conditions that determines whether extraordinary circumstances exist," warranting an EA or EIS. *Id.*

### 2. Healthy Forests Restoration Act

HFRA was originally enacted in 2003 "to reduce wildfire risk to communities, municipal water supplies, and other at-risk Federal land through a collaborative process of planning, prioritizing, and implementing hazardous fuel reduction projects." 16 U.S.C. § 6501(1). In 2014, Congress amended HFRA, establishing the statutory categorical exclusion at issue here—the Insect and Disease exclusion. *See* 16 U.S.C. § 6591b.

This categorical exclusion authorizes "priority projects" to protect forests from insect infestations and disease. *See* 16 U.S.C. § 6591a–b. It contemplates a two-step process for approving such projects. The Forest Service must first designate certain "landscape-scale areas" part of an insect and disease treatment program. 16 U.S.C. § 6591a. Then, the Forest Service may carry out projects within those areas provided they meet the statutory criteria. *Id.* § 6591b.

To qualify, a project must (1) meet certain limitations related to the building of new roads, location, and size, excluding projects of more than 3,000 acres; (2) "maximize[] the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease;" (3) "consider[] the best available scientific information to maintain or restore the ecological integrity;" (4) be "developed and implemented through a collaborative process;" (5) "be consistent with the land and resource

management plan" for the area; and (6) involve "public notice and scoping." 16

U.S.C. § 6591b. Where such requirements are met, HFRA provides that the

project "may be . . . considered an action categorically excluded from the

requirements of [NEPA]." *Id.* § 6591b(a)(1).

### B. The Hyde Park and Pacheco Canyon Projects

The Forest Service approved the two projects at issue here—the Hyde Park

Wildland Urban Interface Project and the Pacheco Canyon Forest Resiliency

Project—pursuant to the authority granted by the Insect and Disease exclusion.

App. at 45, 55 (citing 16 U.S.C. § 6591b). The details of the projects are similar.

The Hyde Park project covers 1,840 acres approximately ten miles northeast of

Santa Fe. The Pacheco Canyon project covers 2,042 acres three miles farther

north.

The forest in each project area comprises mostly ponderosa pine with some

Douglas fir, pinon juniper, and mixed conifer stands. Due in part to years of fire

suppression, the trees in the project areas have grown unnaturally dense.

Specifically, young and smaller trees make up a high percentage of the forest.

Because of this density, many of the small trees cannot access sufficient water

and sunlight. This stunts the trees and renders them vulnerable to insect and

disease outbreaks. The combination of dense growth and disease risk has made

the forest susceptible to a particularly intense type of fire—a crown fire—which

not only burns through the understory as a lower intensity fire might, but also reaches the larger trees in the overstory.

Due to these risks, the Forest Service proposed thinning the forest and applying prescribed burns in the project areas to "combat insect and disease, restore natural fire regimes, improve wildlife habitat, and reduce the risk of uncharacteristic fire effects." App. at 53. Not every acre will be thinned or burned. Thus, after the treatments, a mix of tree densities will remain.

The thinning would target trees less than 16 inches in diameter.[4] Trees larger than 16 inches in diameter would not be thinned except where disease or other unusual circumstances warrant it. The felled trees would then be piled. Subsequent prescribed burns would be utilized to reduce the thinned and piled material and otherwise treat the understory. These burns roughly approximate the effects of naturally occurring fires, which historically occurred every five to ten years, "clearing out the understory while the thick-barked, fire resistant over-story survived." App. at 54. Although not designed to affect the larger trees in the overstory, approximately 10 to 30 percent of the trees larger than 16 inches in diameter may succumb to the controlled burns. According to the Forest Service, similar procedures would need to be repeated every 10 to 15 years to continue replicating naturally occurring wildfire patterns.

_____

[4] The 16-inch limit appears to stem from recommendations contained in scientific literature consulted by the Forest Service.

For both projects, considerable acreage is located within various inventoried roadless areas. But no new roads would be needed to complete either project, and the Forest Service has not planned any new road construction in association with these projects.

The projects were not conceived in isolation. Instead, both projects are part of a larger initiative in the Santa Fe region conducted by the Greater Santa Fe Fireshed Coalition.[5] As part of this endeavor, the Forest Service works with state, local, tribal, and environmental organizations to address the risk of wildfire in the lands around Sante Fe, which cover more than 100,000 acres and are referred to as the Santa Fe Fireshed. The Coalition's primary goal is to "identify and implement high priority on-the-ground projects that make the Fireshed and its communities more resilient to wildfire, while maintaining and restoring resilient landscapes." App. at 33. The Hyde Park and Pacheco Canyon projects represent the Forest Service's first efforts to contribute to the Coalition's goal.[6]

---

[5] The Coalition's members include the Forest Service, the City of Santa Fe, Santa Fe County, the Tesuque Pueblo, the Nature Conservancy, the Santa Fe Watershed Association, the Santa Fe Fat Tire Society, and the U.S.G.S. Jemez Field Station.

[6] The Hyde Park project was initially considered in 2005—prior to the formation of the Coalition—but it was set aside for further analysis. It was then reconsidered as part of the Forest Service's contribution towards the Coalition's goal.

On February 14, 2017, the Forest Service issued a single scoping letter covering both projects. The letter asked for public comment on the projects and noted that they are "part of a larger effort sponsored by the Greater Santa Fe Fireshed Coalition." App. at 37. After comments were received, the Forest Service approved the Hyde Park and Pacheco Canyon projects through decision memos issued on March 21, 2018 and June 1, 2018 respectively.

## C. Procedural History

Wild Watershed brought suit challenging the projects, filing the operative complaint in August 2018.[7] Bringing claims under the APA, NEPA, and HFRA, Wild Watershed sought to set aside the Forest Service's approval of the projects. As relevant here, it argued an EIS was required under NEPA for the larger goal of treating the Fireshed and the less-extensive review actually conducted by the Forest Service failed to adequately consider the projects' effects on inventoried roadless areas and their cumulative impacts on the environment. Additionally, Wild Watershed claimed the projects violate HFRA's requirements that the projects be consistent with the applicable land and resource management plan,

---

[7] Although Wild Watershed initially sought to enjoin the projects, it withdrew this request for relief. Accordingly, certain aspects of the projects have commenced. As of November 2019, 140 acres have been thinned in the Hyde Park project and 246.5 acres have been thinned in the Pacheco Canyon project. Additionally, 500 acres have been burned in the Pacheco Canyon project.

maximize the retention of old growth, and consider the best available scientific evidence to maintain and restore wildlife habitats. *See* 16 U.S.C. § 6591b.

The district court disagreed, holding the Forest Service was under no obligation to follow NEPA requirements because the Insect and Disease exclusion, by its plain terms, provided an exemption. According to the district court, all that could be reviewed was the Forest Service's compliance with the explicit requirements of the Insect and Disease exclusion, codified in 16 U.S.C. § 6591b. These, it held, were satisfied by the Forest Service's review and approval of the projects. Accordingly, the court dismissed Wild Watershed's challenges.

## II. Standard of Review

Because neither NEPA nor HFRA provide for a private right of action, we review the approval of the Hyde Park and Pacheco Canyon projects as a final agency action under the APA. *See Bosworth*, 443 F.3d at 739; *Native Ecosystem Council v. Marten*, CV 17-153, 2018 WL 6046472, at *2 (D. Mo. Nov. 19, 2018). We consider the district court's opinion de novo. *See Am. Wildlands v. Browner*, 260 F.3d 1192, 1196 (10th Cir. 2001). But we apply a "deferential" standard of review to the agency's decision. *Hoyl v. Babbit*, 129 F.3d 1377, 1382 (10th Cir. 1997). We will only overturn agency action if it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In considering whether agency action meets this standard, "we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999). Agency action will not pass muster where the agency relies on factors which Congress did not intend it to consider, fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to the evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.*; *Bosworth*, 443 F.3d at 740.

In applying this standard, we accord agency action "a presumption of validity." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011). Thus, the challenger bears the burden of showing the action is arbitrary and capricious. *Id.* Even though courts adopt a deferential posture in reviewing agency action, we must "engage in a substantive review of the record" to assess the claims. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).

# III.  Analysis

Wild Watershed's challenge proceeds along two paths.  First, it asserts the Forest Service failed to comply with NEPA and its implementing regulations. Second, it contends the Forest Service violated the statutory requirements of HFRA.  We address each in turn.

## A.  Compliance with NEPA

The parties dispute whether, and to what extent, NEPA applies to the approval of the projects.  The Forest Service contends it is exempt from NEPA's requirements.  Wild Watershed disagrees, arguing that when Congress enacted the Insect and Disease exclusion it did not exempt those types of projects wholesale from NEPA.  It focuses on two NEPA requirements in particular as applicable to the projects at issue: the obligation to (1) perform extraordinary circumstances review, and (2) consider the potential cumulative impacts of the projects.

We first consider extraordinary circumstances review and then turn to cumulative impacts.

### 1.  Extraordinary Circumstances Review

Wild Watershed contends the extraordinary circumstances review requirement stems from the statutory text of the Insect and Disease exclusion, which states a project "may be . . . categorically excluded" from the requirements of NEPA.  16 U.S.C. § 6591b(a).  To Wild Watershed, use of the "categorically

excluded" language signifies Congress's intent to incorporate the regulatory

definition of "categorical exclusion" and "all that term entails" into the statutory

provision. Aplt. Br. at 13. Regulations define "Categorical exclusion" as,

> [A] category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. . . . *Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.*

40 C.F.R. § 1508.4 (emphasis added).

This definition mandates extraordinary circumstances review for regulatory

categorical exclusions, and Wild Watershed would therefore have us read such a

requirement into the statutory language of the Insect and Disease exclusion

because "when Congress employs a term of art, it presumably knows and adopts

the cluster of ideas that were attached to each borrowed word in the body of

learning from which it was taken." *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012).

Wild Watershed also relies on the term "may" in the statute. This, it contends,

shows HFRA merely grants administrative discretion to the Forest Service. In

exercising that discretion and deciding to categorically exclude a project, the

Forest Service must be constrained by those regulations that ordinarily govern its

decision to categorically exclude projects, including by mandating extraordinary circumstances review. *See* 40 C.F.R. § 1508.4; 36 C.F.R. § 220.6.

Moreover, Wild Watershed argues, this is exactly how the Forest Service itself has interpreted the statute. Pointing to the Forest Service's handbook and a Frequently Asked Questions document, Wild Watershed contends the Forest Service interpreted 16 U.S.C. § 6591b as requiring extraordinary circumstances review since immediately after passage of the Insect and Disease exclusion. This agency interpretation, it contends, is entitled to deference.

We disagree. Beginning with the text of the statute, the Insect and Disease exclusion omits any explicit requirement to perform extraordinary circumstances review. *See* 16 U.S.C. § 6591b. Where no explicit statutory requirements exist, we generally refrain from reading any in. *Dean v. United States*, 556 U.S. 568, 572 (2009); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012).

But here we are not left to rely on this canon of construction alone. A comparison to other HFRA statutory categorical exclusions shows Congress understands what extraordinary circumstances review entails and how to explicitly require it where it intends to.

In a separate section of HFRA, Congress created a categorical exclusion for applied silvicultural assessments (Applied Silvicultural Assessments exclusion)

using similar language to that at issue here. 16 U.S.C. § 6554(d)(1) (providing that projects "carried out under this section . . . may be categorically excluded from documentation in an environmental impact statement and environmental assessment under [NEPA]"). Yet, unlike in the Insect and Disease exclusion, Congress explicitly mandated that applied silvicultural assessment projects "be subject to the extraordinary circumstances procedures established by the [Forest Service]." *Id.* § 6554(d)(2)(B).

Similarly, in another provision of HFRA, Congress created a statutory categorical exclusion for wildfire resilience projects. *See* 16 U.S.C. § 6591d (establishing the Wildfire Resilience exclusion). Just as it did in the Insect and Disease exclusion and the Applied Silvicultural Assessments exclusion, Congress stated that wildfire resilience projects are "categorically excluded from the requirements of [NEPA]." 16 U.S.C. § 6591d(a)(2). But again, unlike the provision presently at issue, Congress explicitly added that the Forest Service "shall apply the extraordinary circumstances procedures under [36 C.F.R. § 220.6] when using" the Wildfire Resilience exclusion. *Id.* § 6591d(c)(4).

The import of these provisions is clear: Congress does not use the "categorically excluded" language as a term of art necessarily incorporating a requirement to perform extraordinary circumstances review. *Russello v. United States*, 464 U.S. 16, 23 (1983) (holding that where "Congress includes particular

-16-

language in one section of a statute but omits it in another section of the same Act," courts presume that "Congress acts intentionally and purposely in the disparate inclusion or exclusion"); *see also* Scalia & Garner, *supra*, at 170 (noting that under the presumption of consistent usage canon, a word or phrase is presumed to bear the same meaning throughout a statute, and should be interpreted consistently with the way the term is used in other parts of the statute). Where Congress intends extraordinary circumstances review to be required before an agency may rely on a statutory categorical exclusion, it says so explicitly. *See, e.g.*, 16 U.S.C. § 6591d(c)(4).

Accordingly, the absence of an explicit extraordinary circumstances review requirement in the Insect and Disease exclusion leads us to conclude that no such requirement exists under the statute. To our knowledge, every court that has squarely addressed this question has reached the same conclusion.[8] *See, e.g.*, *Marten*, 2018 WL 6046472, at \*5; *Greater Hells Canyon Council v. Stein*, No. 2:17-cv-00843, 2018 WL 3966289, at \*8 (D. Or. June 11, 2018) (Sullivan,

---

[8] We do not suggest courts have treated this question uniformly. The Ninth Circuit, for example, recently assessed the adequacy of the Forest Service's extraordinary circumstances review without deciding the threshold question of whether HFRA mandated such review. *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 781 n.3 (9th Cir. 2019) (noting that it "need not address" whether HFRA mandated extraordinary circumstances review); *Greater Hells Canyon Council v. Stein*, No. 18-35742, 2020 WL 110523, at 1 (9th Cir. Jan. 9, 2020) ("Assuming, without deciding, that the [Insect and Disease exclusion] requires extraordinary circumstances review.").

Magistrate J., proposing findings of fact and recommendations), *adopted by*, 2018 WL 3964801, at *1 (D. Or. Aug. 17, 2018).

Wild Watershed's reliance on the regulatory definition of categorical exclusion, *see* 40 C.F.R. § 1508.4, fails to disturb this result. That definition, by its plain terms, applies only to *regulatory* categorical exclusions. 40 C.F.R. § 1508.4 (defining "Categorical exclusion" as those actions "which have been found to have no such effect *in procedures adopted by a federal agency in implementation of these regulations*" (emphasis added)). It does not reach statutory categorical exclusions such as the Insect and Disease exclusion at issue here. *See Stein*, 2018 WL 3966289, at *8.

Nor do the Forest Service's guidance documents suggesting such review might be appropriate convince us of Wild Watershed's position. [9] Although the FAQ document and Forest Service handbook present some evidence in favor of

---

[9] We consider these materials only for the persuasive value they may hold. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (noting that agency interpretations—no matter what form they take—may be considered for persuasiveness based on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"). Although in its opening brief Wild Watershed sought *Chevron* deference, such deference is inappropriate considering neither the FAQ document nor the Forest Service handbook carries the force of law. *See United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (noting that interpretations contained in policy statements, agency manuals, and enforcement guidelines are "beyond the *Chevron* pale"). In its reply brief, Wild Watershed appears to concede the point by noting that "the handbook, like the FAQ guidance itself, are not enforceable – they are each persuasive for the courts only." Reply at 5.

Wild Watershed's interpretation, we find this insufficient to overcome our conclusion based on the text and structure of HFRA that no extraordinary circumstances review was required prior to approving the projects.

The Forest Service's FAQ document, first issued on May 1, 2014 in the wake of the 2014 Farm Bill's passage, weighs in Wild Watershed's favor. App. at 21 (stating a Forest Service official must conduct extraordinary circumstances review for projects approved under 16 U.S.C. § 6591b). But immediately after issuing this FAQ document, the Forest Service updated its handbook. *See* Forest Service Handbook, Ch. 30, § 32.3 (Amendment No. 1909.15-2014-1, effective May 28, 2014).

The updated handbook is more equivocal. It could be read either as supporting Wild Watershed's interpretation or the Forest Service's position.[10] But we need not definitively resolve the question because we find the Forest Service's guidance documents and past practice insufficiently clear, consistent, or thorough

---

[10] To Wild Watershed's point, the handbook nowhere clearly states the position the Forest Service now advances—that statutory categorical exclusions are exempt from extraordinary circumstances review unless the statute explicitly states otherwise. *See generally* Forest Service Handbook, Ch. 30 (Amendment No. 1909.15-2014-1, effective May 28, 2014). The Forest Service would have us infer this point from the fact that the handbook states extraordinary circumstances review is required for one statutory categorical exclusion— the Applied Silvicultural Assessments exclusion—but omits any similar requirement from the section discussing the Insect and Disease exclusion. *Id.* This is one potential reading of the handbook, but far from the only plausible one.

to be persuasive in interpreting the applicable statutory and regulatory framework. *See Skidmore*, 323 U.S. at 140.

### 2. *Consideration of Cumulative Impacts*

Because we hold 16 U.S.C. § 6591b does not mandate extraordinary circumstances review, we need not address Wild Watershed's arguments with respect to the alleged insufficiencies of that review. *See Wyoming*, 661 F.3d at 1239 (noting the longstanding rule that as long as agencies "compl[y] with the statutory and regulatory minima, absent 'extremely compelling circumstances,' a reviewing court generally may not overturn an agency decision for failure to provide additional procedure"). Under this logic, the district court declined to consider Wild Watershed's claims with respect to cumulative impacts and impacts to inventoried roadless areas.[11]

We agree with respect to inventoried roadless areas, but find more is required before dismissing Wild Watershed's claims with respect to cumulative impacts. Wild Watershed argues consideration of cumulative impacts is required not only as a subcomponent of extraordinary circumstances review, but also independently by HFRA's "scoping" requirement and certain Forest Service regulations. *See* Aplt. Br. at 16. We have rejected the former contention, but not

---

[11] The district court is not alone in this approach. *See Marten*, 2018 WL 6046472, at *5 (similarly dismissing cumulative impacts arguments based on its conclusion that HFRA did not mandate extraordinary circumstances review).

-20-

yet addressed the latter—whether HFRA's "scoping" requirement and certain Forest Service regulations independently require consideration of potential cumulative impacts.

While the parties argue this point in the briefing, we need not definitively resolve it. Assuming, without deciding, that the Forest Service was required under 16 U.S.C. § 6591b to consider the potential cumulative impacts of the projects, we nonetheless find the Forest Service's conduct in this regard sufficient under the APA—that is, neither arbitrary nor capricious. Regulations define "cumulative impact" as,

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

But the Forest Service need not consider any and all past, present, and foreseeable actions. It must only consider those actions that are "relevant and useful" in the agency's judgment, "because they have a significant cause-and-effect relationship with the direct and indirect effects of the proposal for agency action and its alternatives." 36 C.F.R. § 220.4.

-21-

In approving the projects, the Forest Service considered certain potential cumulative impacts in detail. For example, it considered the potential cumulative effects of the expected subsequent treatments in the project areas on sensitive species. It also considered the potential cumulative effects of thinning in multiple areas within the Fireshed on management indicator species and threatened and endangered species. In each instance, it found no adverse cumulative effects.

Wild Watershed slides by these portions of the record and instead asserts that the Forest Service was required to consider a separate type of cumulative impact, namely "the dramatic effects of extensive thinning and . . . burning" on 21,896 acres of Forest Service land within the Fireshed. Aplt. Br. at 21. Specifically, Wild Watershed seeks an assessment of the effects of thinning and burning on roadless areas and old growth habitat. To support its contention that such extensive thinning and burning is, in fact, occurring or reasonably foreseeable, Wild Watershed points to the Coalition's meeting minutes and a map depicting certain "ongoing or planned" projects within the Fireshed. Aplt. Br. at 20–21 (citing App. at 30).

But the Forest Service cannot have acted arbitrarily or capriciously in failing to assess the cumulative effects of something that the record does not show to be either occurring or reasonably foreseeable. *See Wyoming*, 661 F.3d at 1227 (noting agency action benefits from the presumption of validity and the

challenger bears the burden of showing it is arbitrary or capricious). The map Wild Watershed relies on depicts certain projects in the Fireshed and suggests that these are planned or ongoing. These projects do cover 21,896 acres, but, critically, the map does not convey the substance of the projects. That is, the map does not show these are thinning and burning projects.

Nor do the meeting minutes Wild Watershed points to provide clarity. While they discuss additional ongoing or planned projects in the Fireshed, these projects do not align with those depicted on the map. Nor do the minutes elaborate on what the projects described therein involve. Only one project discussed in the meeting minutes (but not depicted on the map) is explained as involving "thinning and piling" and "prescribed fire." App. at 27. No specific acreage is provided for this project. Accordingly, Wild Watershed fails to show the alleged 21,896 acres worth of projects it cites to necessarily warranted consideration for having "a significant cause-and-effect relationship with the direct and indirect effects of the [Hyde Park and Pacheco Canyon projects]." 36 C.F.R. § 220.4; *see also Wyoming*, 661 F.3d at 1227.

Forest Service statements further undercut Wild Watershed's argument. The forest official responsible for approving the projects declared that, at the time of the Hyde Park and Pacheco Canyon projects were approved, the Forest Service lacked "a defined proposal for work across the remaining National Forest System

lands within the Fireshed." Supp. App. at 54 ("The number of acres to be treated, the methods for treating those areas, and the funding to accomplish implementation ha[d] yet to be determined."). Thus, the potential cumulative impacts of the Hyde Park and Pacheco Canyon projects were not considered in conjunction with these other "speculative" components of the larger Coalition initiative. *Id.* Although the map and meeting minutes raise some questions with respect to the number of ongoing or planned projects within the Fireshed and their stage of development, we find these documents insufficient to show the Forest Service acted arbitrarily or capriciously. *Arizona Public Serv. Co. v. E.P.A.*, 562 F.3d 1116, 1123 (10th Cir. 2009) ("We will not set aside agency action on account of a less-than-ideal explanation as long as the agency's decisionmaking process may reasonably be discerned.").[12]

---

[12] Wild Watershed also contends the Forest Service improperly segmented the projects. Aplt. Br. at 19 (arguing the projects "are interdependent parts of a larger action and depend on the larger action for their justification"). Again assuming without deciding that NEPA's prohibition on such segmentation applies to projects such as these, we find the Forest Service's conduct sufficient under APA review. While it is true other projects were anticipated in the Santa Fe Fireshed, the record does not show the projects were so interconnected that they required collective evaluation under NEPA. The projects are several miles apart and occur in separate watersheds that drain to different locations. Supp. App. at 55. Implementation of the projects will proceed independently, with significant differences in funding and participation. *Id.* Moreover, as the Forest Service official responsible for overseeing the projects declared, the projects would proceed even if the larger Coalition initiative did not exist. *Id.* at 54.

Accordingly, Wild Watershed fails to show the projects may be set aside due to any NEPA violation.

## B. Compliance with HFRA

Wild Watershed next claims the projects violate HFRA by failing to adequately (1) develop old growth, and (2) protect certain species of wildlife, namely the northern goshawk and the Abert's squirrel.

### 1. Old Growth

Turning first to Wild Watershed's claims with respect to old growth, HFRA mandates that the Forest Service "maximize[] the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591b(b)(1)(A). The statute further requires the projects "be consistent with the [applicable] land and resource management plan." *Id.* § 6591b(e). Here, that is the Santa Fe National Forest Plan (Forest Plan), which provides numerous criteria governing treatments of areas containing or being developed as old growth forest.

Under the Forest Plan, the Forest Service must, "strive to create or sustain as much old growth compositional, structural, and functional flow as possible over time at multiple-area scales" and "seek to develop or retain old growth function on at least 20 percent of the forested area by forest type in any landscape." App. at 246. Although "[t]hinning is permitted in stands being

managed for old growth when the result will enhance attainment of the old growth characteristics. No treatments should occur in a stand managed for old growth once the stand has achieved minimum structural characteristics of old growth."
*Id.*

We begin with the threshold issue—whether the project areas include any old growth forests. The Forest Service classifies the forest in the project area as "young" based on the use of the Vegetative Structural Stage (VSS) methodology, which uses tree diameter most frequently represented to determine the age of a stand of trees. Where, as here, the forest contains a high prevalence of young trees, this method results in a classification of "young" despite the existence of older trees. Wild Watershed takes issue with this, arguing that because there are some ponderosa pines over 180 years-old—the threshold age to be considered "old growth" under the Forest Plan—in the area, it is nonsensical to classify the forest as young.[13]

We do not agree that such a classification is facially arbitrary or capricious. Under Wild Watershed's logic, the Forest Service would be precluded from classifying a forest as young due to the presence of a single older tree. Moreover,

_____

[13] Although it critiques the methodology used to classify the forest as young, Wild Watershed does not contest the fact that there are too few old trees in the project area to qualify as old growth under the Forest Plan. App. at 247 (stating that for ponderosa pine stands—the most common in the project areas—there must be at least 20 trees per acre that are 18 inches or greater in diameter at breast height and 180 years old to qualify as old growth).

we cannot second guess the Forest Service's classification in this instance. Where challenged agency decisions "involve technical or scientific matters within the agency's area of expertise," our deference to the agency is "especially strong." *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014).

Wild Watershed argues that the VSS methodology is "most frequently" used to assess stands that, unlike those at issue, are "even aged stands." Aplt. Br. at 36. Such a methodology, it argues, has "limited applicability for fuel reduction treatments." *Id.* But such contentions are insufficient to override the requisite deference we give to an agency's technical choices, and they fail to show the Forest Service's reliance on the VSS methodology renders its decision arbitrary or capricious.

The fact that a particular methodology has limited applicability or might be most frequently used in another context casts some doubt on whether it is the *best* approach, but falls short of showing the agency engaged in "a clear error of judgment," "fail[ed] to consider an important aspect of the problem," or "offer[s] an explanation . . . that . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Dombeck*, 185 F.3d at 1167; *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045, 1057 (10th Cir. 2011) ("[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion[] of its own qualified experts, even if, as an

original matter, a court might find contrary views more persuasive." (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989))).

Perhaps recognizing this, Wild Watershed argues that it does not matter whether the forest is classified as old growth, because "even in areas where there is no existing old growth, the [Forest] Service must still manage the best available developing old growth habitat." Aplt. Br. at 24. It argues the Forest Service has failed to do this because the treatments will harm old growth development. We reject this argument because Wild Watershed cannot show that the projects at issue are inconsistent with any of HFRA's or the Forest Plan's directives.

Taking HFRA first, Wild Watershed glosses over an important limitation in the statutory language. The Forest Service is only required to "maximize the retention of . . . large trees . . . *to the extent that the trees promote stands that are resilient to insects and disease*." 16 U.S.C. § 6591b. Here, the projects are specifically designed "so that the risk of insect and disease outbreak[s] [will be] reduced." App. at 43. Without the treatments, the "high density of trees in the project area[s] . . . and the prevalence of small diameter trees" will continue to "contribute to conditions that elevate the risk for insect and disease outbreaks." App. at 142. Indeed, "[t]he risk of tree mortality from insects/diseases, particularly bark beetles, is expected to increase in the project area[s]" unless something is done. *Id.* In short, it is clear from the record that, left untreated, the

forests in the project areas do not "promote stands that are resilient to insects and disease." 16 U.S.C. § 6591b. Accordingly, the Forest Service's decision to treat the forest in the project areas is consistent with HFRA's directives, even to the extent it has some impact on large trees.

Turning to the requirements of the Forest Plan, the record demonstrates the Forest Service has adequately considered old growth and structured the projects to retain and develop such growth consistently with the Forest Plan's directives. Both projects involve treatments that "favor retention of the largest, healthiest fire tolerant species." App. at 144. For both, "[o]ld growth forest [will] be maintained or promoted." *Id*. at 121. No trees over 16 inches in diameter will be thinned, unless certain unusual circumstances such as poor health warrant it. Although some of the large trees may succumb to the prescribed burns, these are designed to be low-intensity fires, which the large ponderosa pines—the oldest trees in the areas—are well equipped to endure. *Id*. at 100 ("Larger pine trees would likely not be killed during burning due to fire-resistant bark.").

Moreover, the treatments will be beneficial in that they will "encourage the remaining trees to grow into larger diameters." *Id*. at 145. Accordingly, the projects are consistent with the Forest Plan's mandate to "sustain as much old growth compositional, structural, and functional flow as possible over time at

multiple-area scales" and enhance the attainment of old growth characteristics.[14]

*Id*. at 246.

The projects are similarly consistent with the Forest Plan's directive to "seek to develop or retain old growth function on at least 20 percent of the forested area by forest type in any landscape." *Id.* The record reveals that a "landscape" varies in size, but generally refers to "contiguous areas of several to 1,000 stands." App. at 260. Meanwhile a stand covers anywhere from 4 to 100 acres. *Id.* Accordingly, a landscape may refer to an area as large as 100,000 acres. This is consistent with the Forest Service's use of the term to refer to the entire Fireshed. The project areas at issue here, by contrast, are much smaller, covering collectively only 3,882 acres. Accordingly, the Forest Service's failure

---

[14] Wild Watershed cites the "decadence" in these woods, suggesting it is the natural result of the areas remaining untouched by human interference for centuries. But these overly dense stands of unhealthy trees are not natural. Such conditions stem from more than a century of human intervention in the form of fire suppression. And now the unnatural conditions threaten the very older trees that Wild Watershed seeks to protect. App. at 100 (noting that under current conditions "large tree loss would continue over long term due to competition, insects and disease"). Wild Watershed argues that the treatments will forever prevent the areas from attaining old growth characteristics, but it has the logic backward. The projects seek only to realign the forest composition and fire cycle with the historical norm. Far from preventing ponderosa pines (the only stands potentially close to attaining old growth characteristics in the project areas) from developing, the treatments aim to do just that. It is only under the *current* conditions—those favored by Wild Watershed—that the record shows no young ponderosa pines will be able to propagate and grow. App. at 95 (noting that "ponderosa pine regeneration is sparse to non-existent" because "[p]onderosa pine is shade intolerant and unable to regenerate under a dense canopy").

-30-

to set aside 20 percent of each project to be managed for old growth does not run afoul of the Forest Plan's mandate, as it is obvious that the Forest Service can still comply with this requirement at the landscape level.

Accordingly, Wild Watershed fails to show the Forest Service acted arbitrarily or capriciously with respect to any old growth requirements.

### 2. *Wildlife*

Finally, Wild Watershed argues that the projects run afoul of HFRA and the Forest Plan for failing to adequately consider the projects' potential adverse impact on the northern goshawk and Abert's squirrel. Under HFRA, the Forest Service must consider "the best available scientific information to maintain or restore the ecological integrity, including maintaining or restoring structure, function, composition, and connectivity" of habitats. 16 U.S.C. § 6591b(b)(1). With respect to the northern goshawk, Wild Watershed argues the Forest Service failed to consider that the northern goshawk requires minimum canopy coverage of 40 percent. In certain places, the projects will thin the canopy coverage down to as low as 35 percent. According to Wild Watershed, this renders the Forest Service's conduct arbitrary and capricious.

We disagree. Despite the fact that "[i]t is unlikely that goshawks occur in the project area," the Forest Service engaged in extensive review of the projects' potential effects on the areas' suitability as habitat for the species. This included

discussion of the effect of reducing, in the short term, the canopy coverage. The Forest Service concedes that high canopy coverage is, indeed, better for goshawk nesting. But it states that the projects will "maintain at least 40% canopy cover where it exists pre-project in suitable goshawk habitat." App. at 149. The thinning will also allow medium size trees to "become more healthy and thus increase their crown size," resulting in increased canopy coverage and an improved habitat in the long term. *Id.*

Further, canopy coverage is not the only important aspect to consider, as the thinning will "benefit prey species" of the goshawks, whose habitats "are declining in the area largely due to fire suppression." *Id.* Overall, the Forest Service notes that in the short term there will be "negative impact[s]" on the suitability of the area for goshawk habitats. *Id.* at 151. But over the long term, the decrease of the "young, overstocked and dense stands of suppressed trees" will create habitat improvements for goshawks and their prey. *Id.* at 103, 151. Given this detailed analysis, we can hardly call the Forest Service's trade-off of some negative short-term consequences for long-term benefits arbitrary or capricious. Instead, such reasoning appears thoughtful and well justified, especially where, as here, it is unlikely any goshawks are currently nesting in the project areas.

Wild Watershed also takes issue with the Forest Service's lack of consideration of the Abert's squirrel, but its argument is no stronger here. To the extent Wild Watershed is concerned about the decrease in canopy coverage's effect on the Abert's squirrel, this was adequately considered and addressed by the Forest Service, as discussed above. To the extent Wild Watershed is instead concerned about a lack of consideration of the squirrel itself, the Forest Service considered the projects' effects on "small mammals" and many management indicator species whose habitat needs allow them to serve as surrogates for the Abert's squirrel. *See* App. at 100, 105–10, 153–58. Accordingly, the Forest Service did not act arbitrarily or capriciously in approving the projects due to insufficient consideration of any squirrels.

## IV. Conclusion

For the reasons stated herein, we hold the Forest Service did not violate any applicable requirement of the National Environmental Policy Act or the Healthy Forests Restoration Act in approving the Hyde Park and Pacheco Canyon projects. Accordingly, the Forest Service complied with the Administrative Procedure Act, and we **AFFIRM** the district court.