**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALLIANCE FOR THE WILD
ROCKIES,

           *Plaintiff-Appellee*,

  v.

CARL PETRICK, his official capacity
as Forest Supervisor for the Idaho
Panhandle National Forests; UNITED
STATES FOREST SERVICE, an
agency of the U.S. Department of
Agriculture; UNITED STATES FISH
AND WILDLIFE SERVICE, an
agency of the U.S. Department of
Interior,

           *Defendants-Appellants*.

No. 21-35504

D.C. No.
2:19-cv-00332-
REP

OPINION

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Magistrate Judge, Presiding

ALLIANCE FOR THE WILD
ROCKIES,

*Plaintiff-Appellee*,

v.

UNITED STATES FOREST
SERVICE, an agency of the U.S.
Department of Agriculture; CARL
PETRICK, in his official capacity as
Forest Supervisor for the Idaho
Panhandle National Forests,

*Defendants-Appellants*.

No. 21-35785

D.C. No.
2:21-cv-00244-
BLW

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted October 20, 2022
Seattle, Washington

Filed May 16, 2023

Before:  Ryan D. Nelson, Danielle J. Forrest, and Jennifer
Sung, Circuit Judges.

Opinion by Judge R. Nelson

# SUMMARY[*]

## Environmental Law / Timber Projects

The panel vacated the district court's grant of summary judgment in *Hanna Flats I*, and vacated the district court's preliminary injunction in *Hanna Flats II,* in two appeals involving an ongoing dispute over the Hanna Flats logging project in the Idaho panhandle (the "Project").

The United States Forest Service designated several thousand acres of national forest for various treatments, including commercial logging, to reduce the risk of wildfires and disease. The Forest Service invoked a categorical exclusion from National Environmental Policy Act (NEPA) review for projects in the wildland-urban interface. In *Hanna Flats I*, the district court granted summary judgment for Alliance for the Wild Rockies, based on reasoning that the record did not show that the Project fell within the statutory definition of wildland-urban interface, and ordered further analysis supporting the categorical exclusion on remand. Subsequently, the Forest Service issued a Supplement to the Decision Memo further justifying the categorical exclusion. In *Hanna Flats II,* the district court issued a preliminary injunction based on the reasoning that the Forest Service could not invoke the categorical exclusion.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that in *Hanna Flats I*, the district court erred in finding that Alliance's public comments adequately put the Forest Service on notice of its eventual claim.

The panel concluded that it had appellate jurisdiction. First, the panel held that the appeal was not moot. The parties did not intend to settle this matter; and the government's compliance with the judgment of a lower court—even where compliance involved a new agency decision—did not necessarily moot the appeal, especially where some redress remained possible. Second, the Forest Service had standing to pursue this appeal. The Forest Service remains injured by the final judgment in *Hanna Flats I*, and this court can redress that injury with a favorable decision.

The panel next evaluated whether the doctrine of administrative waiver barred Alliance's challenge in *Hanna Flats I* because Alliance did not raise its arguments during the public-comment period. First, the panel held that the Forest Service sufficiently preserved its notice argument, even though it framed notice as an exhaustion requirement below and as a waiver issue on appeal. Second, the panel held that Alliance's comments did not put the Forest Service on notice of the wildland-urban interface issue. Alliance's vague and generalized statement that the district court cited, contained within more than a hundred pages of comments, did not provide sufficient notice to the government of Alliance's current concerns. Alliance therefore never gave the Forest Service an opportunity to consider the issue presented by Alliance's eventual claim in federal court. Alliance's comment did not identify any violation of the Healthy Forests Restoration Act ("HFRA"), nor did it allege that the Project fell outside the wildland-urban interface. In addition, Alliance's other comments were even

more removed from Alliance's claim. The panel remanded for the district court to consider Alliance's unaddressed argument that there was no administrative-objection requirement in this context.

In *Hanna Flats II*, which Alliance brought after the Forest Service complied with the remand order and issued the Supplement, the district court enjoined the implementation of the Project because it found serious questions about whether the Forest Service validly applied HFRA's categorical exclusion to the Project. First, the parties disagreed on the standard of review that should be applied to the Forest Service's decision to rely on a categorical exclusion. Pursuant to the text of the Administrative Procedures Act ("APA") and precedent, the panel reviewed the Forest Service's reliance on HFRA's categorical exclusion under the familiar arbitrary or capricious standard. Next, the panel considered the district court's ruling that there were serious questions about the application of the categorical exclusion. The panel held that the district court did not, as the Forest Service contended, impermissibly create and impose new procedural duties on the Forest Service. It simply held the Forest Service to the strictures already required by the APA (and, by extension, HFRA). Turning to the district court's analysis, the panel agreed with the district court that, under these facts, the Project's location within the area designated as wildland-urban interface by the Bonner County community plan was not enough to establish the valid application of the categorical exclusion. However, the district court's conclusion—that there were serious questions whether the categorical exclusion applied—was based on an erroneous interpretation of the HFRA. Because the preliminary injunction was based on faulty legal premises, the panel

vacated and remanded.  Finally, the panel held that there was no reason to conclude that it should exercise its equitable discretion to leave an injunction in place that was wrongly granted, and where there was no clear likelihood of success on another claim.

## COUNSEL

Joan M. Pepin (argued), Rachel E. Heron, John P. Tustin, and Emma L. Hamilton, Attorneys; Todd Kim, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice; Washington, D.C.; Rickey D. Turner, Attorney; Environment and Natural Resources Division, United States Department of Justice; Denver, Colorado; Elise Foster, Attorney; United States Department of Agriculture, Office of the General Counsel; Washington, D.C.; for Defendants-Appellants.

Rebecca K. Smith (argued), Public Interest Defense Center, Missoula, Montana, for Plaintiff-Appellee.

## OPINION

R. NELSON, Circuit Judge:

We address two appeals involving an ongoing dispute over the Hanna Flats logging project (the Project) in the Idaho panhandle.  The United States Forest Service designated several thousand acres of national forest for various treatments, including commercial logging, to reduce the risk of wildfires and disease.  The Forest Service invoked a categorical exclusion from National Environmental Policy

Act (NEPA) review for projects "in the wildland-urban interface."  16 U.S.C. § 6591b(c)(2)(A).

In the first case (*Hanna Flats I*), the district court granted summary judgment for Alliance for the Wild Rockies (Alliance), reasoning that the record did not show that the Project fell within the statutory definition of "wildland-urban interface," and ordered further analysis supporting the categorical exclusion on remand.

The Forest Service complied and issued a Supplement to the Decision Memo further justifying the categorical exclusion.  But in a new action (*Hanna Flats II*), the district court issued a preliminary injunction, again reasoning that the Forest Service could not invoke the categorical exclusion.

We find reversible error in both cases.  In *Hanna Flats I*, we conclude that the district court erred in finding that Alliance's comment adequately put the Forest Service on notice of its eventual claim.  We remand to the district court to consider Alliance's unaddressed argument that there is no administrative-objection requirement in this context.

In *Hanna Flats II*, we agree with the district court that, under these facts, the Project's location within the area designated as wildland-urban interface by the Bonner County community plan alone is not enough to establish the valid application of the categorical exclusion.  But the district court's conclusion that there were serious questions whether the categorical exclusion applied was based on an erroneous interpretation of the Healthy Forests Restoration Act (HFRA).  Because the preliminary injunction was issued on faulty legal premises, we vacate it and remand.

I

This case involves the interplay between two statutory regimes: NEPA and HFRA. "Congress enacted NEPA to establish a national policy for the environment." *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 674 (9th Cir. 2022). "NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004). NEPA requires the preparation of an environmental impact statement (EIS) for "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1062 (9th Cir. 1998) (quoting 42 U.S.C. § 4332(C)).

To decide whether an EIS is needed, the agency can first prepare an environmental assessment (EA) "to determine whether a proposed federal action will have a significant impact." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238–39 (9th Cir. 2005) (citation omitted). "Some actions, however, are categorically excepted or excluded from NEPA's procedural requirements." *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 777 (9th Cir. 2019). When a categorical exclusion applies, the agency need not prepare an EIS or EA. *Mountain Cmtys. for Fire Safety*, 25 F.4th at 675.

HFRA creates one such statutory exclusion. HFRA "directs the Forest Service to take action to 'reduce wildfire risk' and 'enhance efforts to protect watersheds and address threats to forest and rangeland health.'" *WildWest Inst. v. Bull*, 547 F.3d 1162, 1165 (9th Cir. 2008) (quoting 16 U.S.C.

§ 6501(1), (3)). "Specifically, the Forest Service is required '[a]s soon as practicable' to implement an 'authorized hazardous fuel reduction project[]' on federal land" where certain imminent risks exist. *Id.* (alterations in original) (quoting 16 U.S.C. § 6512(a)(4)). HFRA also requires public notice of the decision-making process and public collaboration. *Id.* at 1166. And typically, projects under HFRA require NEPA compliance, meaning the preparation of an EA and potentially an EIS. *See id.* at 1165 (citing 16 U.S.C. § 6514(a)).

But HFRA provides a statutory categorical exclusion to NEPA when the project is located "in the wildland-urban interface." 16 U.S.C. § 6591b(c)(2)(A). Broadly speaking, a "wildland-urban interface" is an area where structures and other human development intermingle with undeveloped wild areas. Wildfires pose extraordinary risks to life and property in such areas. HFRA specifically defines a "wildland-urban interface" as "an area within or adjacent to an *at-risk community* that is identified in recommendations to the Secretary in a *community wildfire protection plan*." *Id.* § 6511(16)(A) (emphases added).[1] An "at-risk community" must satisfy multiple requirements; as relevant here, it "is comprised of . . . a group of homes and other structures with basic infrastructure and services . . . within or adjacent to Federal land." *Id.* § 6511(1)(A)(ii).

A

In August 2017, the Forest Service issued a Scoping Notice announcing an agency project in the Idaho Panhandle

---

[1] A separate definition applies "in the case of any area for which a community wildfire protection plan is not in effect." *Id.* § 6511(16)(B). That definition is not applicable here because there is a community wildfire protection plan in place.

National Forests within Bonner County, Idaho. The Project involves several treatments, including commercial thinning, noncommercial thinning, and prescribed burning. The Forest Service, through the Project, seeks to remove forest fuel hazards to minimize wildfire risk and remove diseased trees spanning 6,814 acres, nearly 97% of which is public land.

The Forest Service sought public comment. The Scoping Notice stated that the Project would likely be exempt from NEPA because of HFRA's categorical exclusion, since "the entire project area is in the wildland-urban interface," as defined by Bonner County's Community Wildfire Protection Plan (the Bonner County community plan). Members of the public, including Alliance, provided extensive comments.

The Forest Service issued a Decision Memo authorizing the Project. Like the Scoping Notice, the Decision Memo invoked HFRA's categorical exclusion because the Project fell within the wildland-urban interface.

B

In *Hanna Flats I*, Alliance brought several claims seeking judicial review of the Forest Service's Decision Memo approving the Project. *All. for the Wild Rockies v. Higgins*, 535 F. Supp. 3d 957, 962 (D. Idaho 2021). At issue on appeal is Alliance's claim that the Project does not qualify for HFRA's categorical exclusion because it is not within the "wildland urban interface."

The parties cross-moved for summary judgment, and the district court granted summary judgment for Alliance. *Id.* at

975, 981.**²**   First, the district court ruled that Alliance had sufficiently exhausted its administrative remedies.  *Id.* at 974–75.  Then, the district court concluded that the record did not show that the Project qualified for the categorical exclusion.  *Id.* at 975–79.  Though the Forest Service determined that the Project fell within the wildland-urban interface as identified in the Bonner County community plan, that plan defines wildland-urban interface differently than does the HFRA.  *Id.* at 979.  Thus, the community plan could not support use of the categorical exclusion.  *Id.*

Finally, the district court concluded that remand without vacatur was proper.  *Id.* at 980.  The district court directed the Forest Service to issue a supplemental Decision Memo to explain how the Project area falls within the wildland-urban interface under HFRA.  *Id.* at 980–81.

About a month later, the Forest Service issued a Supplement to the Decision Memo (the Supplement).  The Forest Service explained that the Project fell within the wildland-urban interface—and thus qualified for the categorical exclusion—because it was "entirely within the Bonner County [wildland-urban interface] as it is defined in the County's [community wildfire protection plan]."  The Supplement provided a map of the Project, the surrounding area, and the Bonner County community plan's wildland-urban interface.   It also highlighted nearby locations Nordman and Lamb Creek as at-risk communities.

In *Hanna Flats II*, Alliance sued the Forest Service again and sought a preliminary injunction against implementation of the Project.  *All. for the Wild Rockies v. Pierson*, 550 F.

---

² Chief Magistrate Judge Bush decided *Hanna Flats I* with the parties' consent.  *See* 28 U.S.C. § 636(c).

Supp. 3d 894, 895 (D. Idaho 2021). The district court granted the motion, noting "serious questions" about the valid application of the categorical exclusion to the Project. *Id.* at 898. The district court reasoned that the Bonner County community plan still could not justify use of the categorical exclusion because it departed from HFRA's definition of wildland-urban interface. *Id.* at 899–900. The district court also rejected the Forest Service's argument that the Supplement demonstrated that Nordman and Lamb Creek were "at-risk communities" under HFRA. *Id.* at 901–04. The Forest Service appealed both orders.

## II

We begin with the Forest Service's appeal of the district court's grant of summary judgment in *Hanna Flats I*. We have jurisdiction under 28 U.S.C. § 1291 and "review de novo a district court's grant of summary judgment." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1216 (9th Cir. 2022) (citation omitted). When a "case involves review of a final agency determination under the Administrative Procedure Act," our "review is limited to the administrative record." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

## A

We start with jurisdiction. Alliance argues that *Hanna Flats I* is moot because the Forest Service has completed its remand analysis and provided thirty days' notice from the start of the Project, as ordered by the district court.[3] Alliance

---

[3] We denied the motion to dismiss for lack of jurisdiction without prejudice to renewing the arguments in the answering brief. Though the briefing on appeal raises a slightly different theory, we consider the full

also argues that the Forest Service lacks standing because it has complied with the remand order.  Alliance is incorrect, and we decline to dismiss the *Hanna Flats I* appeal.

1

To begin, the appeal is not moot.  Article III "requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011)). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Id.* (quoting *Ruiz v. City of Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998)).

"Compliance with a judgment pending appeal presents distinctive mootness questions," but "[t]he general rule is now well settled: the case is not moot unless the parties intended to settle, or unless it is not possible to take any effective action to undo the results of compliance."  13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3533.2.2 (3d ed.); *see United States ex rel. Morgan & Son Earth Moving, Inc. v. Timberland Paving & Constr. Co.*, 745 F.2d 595, 598 (9th Cir. 1984) ("The usual rule in federal courts is that satisfaction of judgment does not foreclose appeal.").  Here, the parties did not intend to settle this matter.  And a long line of Supreme Court authority instructs that the government's compliance with the judgment of a lower court—even where compliance

---

extent of the arguments to ensure our jurisdiction.  *Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002) ("[A] court may raise the question of subject matter jurisdiction, *sua sponte*, at any time during the pendency of the action, even on appeal.").

involves a new agency decision—does not necessarily moot an appeal, especially where some redress remains possible.

For example, the issuance of provisional regulations by the Secretary of the Department of Health and Human Services did not moot controversy over the validity of the original regulations. *Schweiker v. Gray Panthers*, 453 U.S. 34, 42 n.12 (1981). "In issuing the provisional regulations, the Secretary simply was adhering to the lower court's reasoning and mandate," and the Secretary had represented "that the new regulations probably would be rescinded if the Court of Appeals' decision were reversed." *Id.* Likewise, the adoption of a new regulation did not moot an appeal involving the previous regulation when the new regulation was "only for the purpose of interim compliance with the District Court's judgment and order" and when the "appeal was taken and submitted on the theory that [the state] desires to reinstate the invalidated regulation." *Maher v. Roe*, 432 U.S. 464, 468 n.4 (1977). And a revision to challenged regulations to comply with a court order did not moot the case when the government's subsequent actions were "consistent with a desire to reinstate its prior regulations." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 791 n.1 (1985).

So too here. The Forest Service's compliance with the district court's judgment does not moot this appeal. The Forest Service issued the Supplement "in response to the Idaho District Court's order." The Forest Service has consistently claimed it should be allowed to proceed based on the original Decision Memo alone and intends to rescind the Supplement if this court reverses the decision below. The agency rightly complied with the district court's judgment. Still, the effect of that compliance can be undone

by withdrawal of the Supplement that the judgment mandated. Thus, the matter is not moot.

2

For similar reasons, the Forest Service has standing to pursue this appeal. The doctrine of standing, which also arises from Article III, "requires the litigant to prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). This requirement persists "throughout all stages of litigation" and "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Id.* at 705 (quoting *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 64 (1997)).

Alliance contends that the Forest Service lacks any redressable injury because this court can no longer provide any relief in *Hanna Flats I* given the Forest Service's Supplement. According to Alliance, even a favorable decision from this court cannot remedy the Forest Service's voluntary compliance with the district court's remand order.

Yet Alliance does not dispute that the district court's judgment renders the Forest Service unable to withdraw the Supplement, as the Forest Service currently wishes to do. And although the remand order from *Hanna Flats I* has been fully complied with, we have the power to undo the effects of that compliance. *Cf. DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1039 (9th Cir. 2006) (holding that appeal remained justiciable despite compliance with court-ordered sale because sale could "be undone"). The Forest Service remains injured by the final judgment in *Hanna*

*Flats I*, and this court can redress that injury with a favorable decision. Therefore, the Forest Service has standing.

Alliance relies on *Natural Resource Defense Council v. Gutierrez* for the proposition that an agency has "no standing to challenge the district court's legal rulings in the abstract." 457 F.3d 904, 906 (9th Cir. 2006) (per curiam). That case involved a unique set of facts where an agency did "not challenge" the only relief granted (a permanent injunction) and instead sought only to excise a portion of the district court's ruling stating that the agency had violated a statute. *Id.* We declined to "line-edit the district court's ruling" because parties must seek "a reversal or a modification of the relief granted by the district court." *Id.* (citation omitted). Here, by contrast, the Forest Service seeks to reverse the relief granted by the district court by withdrawing the Supplement that it was ordered to create.

Alliance also cites *Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020). There, we rejected a challenge to our appellate jurisdiction, distinguishing *Gutierrez* because the Fish and Wildlife Service did "challenge what the district court ordered it to do on remand." *Id.* at 676. The Fish and Wildlife Service was therefore not "merely seek[ing] an advisory opinion." *Id.* Likewise here, the Forest Service challenges what the district court ordered it to do on remand. Though *Crow Indian Tribe* involved a challenge made before the agency complied with the remand, that does not alter its application because, as discussed, the Forest Service can still turn to this court to undo the order's effects.

We therefore conclude that the doctrines of mootness and standing do not deprive us of appellate jurisdiction and so turn to the merits of the appeal.

B

We next evaluate whether the doctrine of administrative waiver bars Alliance's challenge in *Hanna Flats I* because Alliance did not raise its arguments during the public-comment period.

"[A]s a general rule . . . courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see Sisley v. DEA*, 11 F.4th 1029, 1035 (9th Cir. 2021) (same). And absent exceptional circumstances, failure to raise arguments before an agency, such as in comments during a public-comment process, usually waives a litigant's rights to make those arguments in court. *See Exxon Mobil Corp. v. EPA* 217 F.3d 1246, 1249 (9th Cir. 2000) ("Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule . . . ."). Thus, the question is whether Alliance adequately raised in its public comments that the Project was not within the wildland-urban interface or that the wildland-urban interface was not a basis for the exclusion.

1

At the start, we note the Forest Service has created some confusion about its precise argument. On appeal, the Forest Service frames the issue as one of administrative waiver. Yet below, the Forest Service framed the issue as one of administrative exhaustion. This change in the Forest Service's framing of the issue matters because waiver and exhaustion are related but distinct doctrines: "the waiver rule only forecloses arguments that may be raised on judicial

review; it is not an exhaustion of remedies rule that forecloses judicial review." *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1020 (9th Cir. 2004). Further, the waiver and exhaustion doctrines do not apply under the same circumstances and do not have the same exceptions. *See, e.g., Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023–24 (9th Cir. 2007) (discussing differences).

For purposes of this appeal, we understand the Forest Service to be specifically invoking the doctrine of waiver. In fact, the Forest Service's reply brief expressly disclaims reliance on the doctrine of exhaustion.

There is no "bright line rule" when determining whether a matter has been properly raised below, but the usual standard requires simply "that the argument . . . be raised sufficiently for the trial court to rule on it." *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016) (quoting *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992)). The Forest Service's labelling of its argument is not dispositive in this instance, as even this court has "phrased" waiver principles "in terms of standing or exhaustion." *Portland Gen. Elec. Co.*, 501 F.3d at 1023. Not that the doctrines are the same, or that any time the government raises exhaustion, it can change course and argue waiver on appeal. But the question of preservation should not elevate form over substance, particularly on an issue where labels have been used imprecisely in the past.

The Forest Service sufficiently preserved its notice argument, even though it framed notice as an exhaustion requirement below and as a waiver issue on appeal. Looking to the essence of the Forest Service's argument below, the parties focused on whether Alliance's comments

"sufficiently alerted" the Forest Service "of its concern about how the wildland-urban interface was delineated for the Project." *Hanna Flats I*, 535 F. Supp. 3d at 974. That inquiry, asking whether arguments had been "adequately raised before the agency" during a public-comment period, is an element of both exhaustion and waiver, but turns on a principle "best characterized as waiver." *Portland Gen. Elec. Co.*, 501 F.3d at 1023. The district court concluded that Alliance "put [the Forest Service] on notice of the issue," 535 F. Supp. 3d at 974, which created a sufficient record for us to review the question of whether Alliance gave adequate notice on appeal, *W. Watersheds Project v. U.S. Dep't of Interior*, 677 F.3d 922, 925 (9th Cir. 2012) ("There is no waiver if the issue was raised, the party took a position, and the district court ruled on it."). We thus assess the Forest Service's notice argument.

2

We conclude that Alliance's comments did not put the Forest Service on notice of the wildland-urban interface issue. The district court relied on a single comment from Alliance to satisfy notice:

> The forest plan Glossary definition of [wildland-urban interface] under (A) has allowed entities other than the general public to set [wildland-urban interface] boundaries outside of NEPA . . . processes, and under (B) defines it so vaguely as to expand the delineation of the [wildland-urban interface] greatly – again outside . . . NEPA processes.

*See Hanna Flats I*, 535 F. Supp. 3d at 974. This sole statement bears little resemblance to Alliance's arguments in court.

The doctrine of administrative waiver "protects the agency's prerogative to apply its expertise, to correct its own errors, and to create a record for our review." *Portland Gen. Elec. Co.*, 501 F.3d at 1024. "In general, we will not invoke the waiver rule in our review of a notice-and-comment proceeding if an agency has had an opportunity to consider the issue." *Id.* But challengers to government action cannot avoid waiver with "cryptic and obscure" objections or issues presented at a very high level of generality. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978). Rather, they must present timely and "particular objections" that "alert[] the agency to the [parties'] position and contentions" and allow "the agency to give the issue meaningful consideration." *Pub. Citizen*, 541 U.S. at 764 (second alteration in original) (citation omitted); *see Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010).

Here, Alliance's vague and generalized statement that the district court cites, contained within more than a hundred pages of comments, did not provide sufficient notice to the government of Alliance's current concerns. That comment complains only that the definition of "wildland-urban interface" is vague and allows "entities other than the general public to set [wildland-urban interface] boundaries." This may reflect a broad concern about the size of the wildland-urban interface. And it may even be a criticism of HFRA. But it is not a claim that the Forest Service has violated HFRA—the claim raised in court.

Alliance therefore never gave the Forest Service "an opportunity to consider the issue," *Portland Gen. Elec. Co.*, 501 F.3d at 1024, presented by Alliance's eventual claim in federal court: "The Forest Service has failed to establish that this Project is in 'wildland urban interface' as defined under the HFRA." Alliance's comment does not identify any violation of HFRA; nor does it allege that the Project falls outside the wildland-urban interface. Even more, the wildland-urban interface definition complained about (found in the glossary of terms attached to the Idaho Panhandle National Forests Land Management Plan) is identical to HFRA's definition of wildland-urban interface. This comment could not have reasonably alerted the Forest Service to Alliance's eventual claim that the Project violated HFRA's definition of wildland-urban interface, when the comment complained of the very definition used by HFRA.

Alliance also points to other comments and portions of the record. For example, Alliance cites comments requesting a map of the density of human residences within 1.5 miles of the project unit boundaries, the exact criteria for a place to be designated as a "landscape-scale insect and disease area," and a detailed map of condition classes and fire regimes. Alliance argues that, taken together, the record shows that the Forest Service was on notice that it lacked a basis to categorically exempt the Project from NEPA "based upon a claimed need for wildland-urban interface fuels reduction to protect structures or residences" in the Project. Yet these comments are even more removed from Alliance's claim. The Forest Service may have been broadly aware that Alliance was concerned about the need for the Project or the potential lack of risk to local communities or structures because of wildfire. But Alliance did not mention before the agency that the Forest Service failed to establish that the

Project was in the wildland-urban interface as defined by HFRA. That is the claim that Alliance has raised in court.

Alliance did not put the Forest Service on notice about the issue that would provide the basis for Alliance's eventual claim in federal court. The district court erred in concluding otherwise.[4]

\*\*\*

The district court's grant of summary judgment for Alliance was based on the incorrect conclusion that Alliance's public comments sufficiently alerted the Forest Service of the concerns that undergird its current court challenge. We thus vacate the grant of summary judgment and remand for the district court to consider in the first instance whether any such comments were necessary to challenge a project exempted from NEPA analysis by a categorical exclusion.

## III

We now address *Hanna Flats II*, which Alliance brought after the Forest Service complied with the remand order and

---

[4] Alliance provides an alternative argument for affirmance on this issue: that challengers need not file an administrative objection for projects exempted from NEPA analysis with a categorical exclusion. The district court declined to resolve this issue below. *Hanna Flats I*, 535 F. Supp. 3d at 974 n.14. "[W]e generally do not resolve issues that the district court did not first reach." *Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1049 (9th Cir. 2021). While we have discretion to resolve this question, *Singleton v. Wulff*, 428 U.S. 106, 120–21 (1976), the issue is better left for the district court in the first instance on remand. Alliance may raise other waiver-specific arguments that the district court concludes were reasonably not made previously given the Forest Service's framing of the issue as one of exhaustion.

issued the Supplement.[5]   The district court enjoined the implementation of the Project because it found "serious questions" about whether the Forest Service validly applied HFRA's categorical exclusion to the Project.  *Hanna Flats II*, 550 F. Supp. 3d at 898.  We have jurisdiction under 28 U.S.C. § 1292(a)(1) and vacate the preliminary injunction.

## A

To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22–23 (2008).  This court has also instructed that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

We review a district court's decision to grant a preliminary injunction for abuse of discretion.  *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).  "An abuse of discretion will be found if the district court based its decision on an erroneous legal standard or clearly erroneous finding of fact."  *Cottrell*, 632 F.3d at 1131 (internal quotation marks and citation omitted).  We review conclusions of law de novo and findings of fact for clear error and "will not reverse the district court where it got the law right, even if we would have arrived at a

---

[5] The Forest Service concedes that it did not raise an administrative waiver argument in *Hanna Flats II*.

different result, so long as the district court did not clearly err in its factual determinations."  *Id.* (internal quotation marks and citation omitted).

B

The parties disagree at the outset about the standard of review that we apply to the Forest Service's decision to rely on a categorical exclusion.  The Forest Service submits that we should apply the traditional "arbitrary or capricious" standard.  But Alliance argues that a less deferential standard of "reasonableness" applies.

Usually, where a statute fails to provide a private right of action, judicial review of an agency action proceeds under the Administrative Procedure Act (APA).  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990); 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").  Under the APA, an agency action may not be upheld if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Here, "neither NEPA nor HFRA provide for a private right of action" for violating their provisions.  *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1125 (10th Cir. 2020); *accord Lujan*, 497 U.S. at 882 (addressing NEPA); *Native Ecosystems Council v. Erickson*, 330 F. Supp. 3d 1218, 1228 (D. Mont. 2018) (addressing HFRA).  Thus, the general rule suggests that we apply arbitrary or capricious review.

To support its contention that a reasonableness standard should apply, Alliance invokes our instruction that "the less deferential standard of 'reasonableness' applies to threshold agency decisions that certain activities are not subject to

NEPA's procedures." *Northcoast Env't Cent. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998). *Glickman* involved review of an agency's determination that an EIS was not required because the project did not constitute a "major federal action." *Id.* We applied a more stringent standard since the dispute "involve[d] primarily legal issues . . . based upon undisputed historical facts." *Id.*; *see Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995) ("We find that it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominantly legal questions.").

Yet *Glickman* did not involve the invocation of a categorical exclusion. Alliance cites no authority establishing that a "reasonableness" standard applies in this context. Quite the contrary, we have consistently reviewed an agency's reliance on a categorical exclusion under the arbitrary or capricious standard. *See Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.5 (9th Cir. 1999) ("The question of whether an action . . . fits within the categorical exclusion is a factual determination that implicates substantial agency expertise and is reviewed under the arbitrary and capricious standard."); *see also Mountain Cmtys. for Fire Safety*, 25 F.4th at 680 ("Given the deferential standard of review, we cannot say that the Forest Service's decision to apply [the categorical exclusion] was arbitrary and capricious."); *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 795 (9th Cir. 2012) ("We will uphold an agency's reliance on a categorical exclusion if 'the application of the exclusions to the facts of the particular action is not arbitrary and capricious.'") (quoting *Bicycle*

*Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 & n.5 (9th Cir. 1996)).

Following the text of the APA and our precedent, we review the Forest Service's reliance on HFRA's categorical exclusion under the familiar arbitrary or capricious standard. Applying that standard, we set aside an agency's action

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## C

Turning to the merits, the district court ruled that there were "serious questions as to whether the [Forest Service] has adequately demonstrated that the Project area falls within HFRA's statutory definition of the wildland-urban interface, and thus whether the [Forest Service's] invoking of HFRA's categorical exclusion is unlawful." *Hanna Flats II*, 550 F. Supp. 3d at 899. The Forest Service challenges this ruling on multiple grounds, which we address in turn.

## 1

The Forest Service first contends that the district court violated the prohibition against "impos[ing] procedural requirements not explicitly enumerated in the pertinent statutes," *Lands Council v. McNair*, 537 F.3d 981, 993 (9th

Cir. 2008) (en banc) (internal quotation marks and citation omitted), by creating a new duty to analyze and show the wildland-urban interface's location before invoking the categorical exclusion.

The Forest Service relies on *Oregon Natural Desert Association v. U.S. Forest Service*, where we rejected an argument under the APA and National Forest Management Act (NFMA) that the agency acted arbitrarily or capriciously when it failed to "analyze and show" that grazing authorizations were consistent with the governing forest plan. 957 F.3d 1024, 1033–35 (9th Cir. 2020). There, we distinguished caselaw about an agency's obligations to produce NEPA-mandated documentation because NEPA did not govern. *Id.* at 1034. We emphasized that the particular duty invoked by plaintiff—mandating "a project's consistency analysis to be memorialized at the time the project is authorized"—did not apply "in the absence of NEPA's requirements." *Id.* Nor did any "statute, regulation, or caselaw" impose the specific obligation "to memorialize each site-specific grazing authorization's consistency with the forest plan." *Id.* We declined to read that duty into the APA or NFMA and therefore concluded that "the absence of such a document [was] not in itself arbitrary and capricious." *Id.*

*Oregon Natural Desert Association* does not control. The district court did not craft any new procedural duties or graft duties from other statutory schemes. The district court concluded that there were serious questions about whether the Forest Service had "adequately demonstrated" that the Project fell within the wildland-urban interface, but it did not impose any duties beyond what the APA requires. *Hanna Flats II*, 550 F. Supp. 3d at 899. "[T]he touchstone of 'arbitrary and capricious' review under

the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52). That means an agency's action can only survive arbitrary or capricious review where it has "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (citation omitted); *see Cal. Pub. Utils. Comm'n v. FERC*, 29 F.4th 454, 463 (9th Cir. 2022).

Tracking the duties already imposed by the APA, the district court concluded that the exclusive justification found in the record for applying the categorical exclusion—that the Project is within the Bonner County community plan's definition of the wildland-urban interface—did not provide a satisfactory explanation for avoiding NEPA compliance.[6] *Hanna Flats II*, 550 F. Supp. 3d at 900. Though the district court also noted the Forest Service's "failure to conduct an analysis" applying HFRA's definition of wildland-urban interface, it only did so because it found the Forest Service's "exclusive reliance" on the Bonner County community plan's definition insufficient. *Id.* The district court did not purport to create a freestanding duty that the Forest Service conduct a type of independent analysis to be memorialized in every categorical-exclusion case.

In sum, the district court did not, as the Forest Service contends, impermissibly create and impose new procedural

---

[6] Moreover, Alliance's claim is not limited to arguing that the Forest Service had a unique procedural duty to independently analyze the location of the wildland-urban interface. Alliance alleges more broadly that the Forest Service "violate[d] . . . HFRA" by relying on the Bonner County community plan which did not use "the definition of 'at-risk community' from the HFRA to define and map its wildland urban interface."

duties on the Forest Service. It simply held the Forest Service to the strictures already required by the APA (and, by extension, HFRA). The question thus becomes whether the district court's analysis was proper.

2

The Forest Service next contends that its Decision Memo and Supplement offered a sufficient explanation for use of the categorical exclusion simply by noting that the Project is within the wildland-urban interface identified by the Bonner County community plan.

Under HFRA, the wildland-urban interface is "an area within or adjacent to an at-risk community that is identified . . . in a community wildfire protection plan." 16 U.S.C. § 6511(16)(A). Here, Bonner County adopted such a plan, and the Project falls within the area defined by the plan as wildland-urban interface. The Forest Service emphasizes that the local community—not the Forest Service— identifies the wildland-urban interface in a community plan. And so the Forest Service argues that it can simply rely on the fact that the Project is within the Bonner County community plan's identified wildland-urban interface; nothing else is required when invoking HFRA's categorical exclusion.

The district court rejected this argument, emphasizing that the Bonner County community plan "uses a definition that is inconsistent with HFRA's definition of the wildland-urban interface." *Hanna Flats II*, 550 F. Supp. 3d at 899 (citing *Hanna Flats I*, 535 F. Supp. 3d at 978–79). Adopting analysis from the summary judgment order in *Hanna Flats I*, the district court explained:

> Although a county's wildfire protection plan
> can be relied upon in assessing the wildland-
> urban interface, where, as here, a wildfire
> protection plan defines the wildland-urban
> interface differently than HFRA, the wildfire
> protection plan definition cannot provide the
> justification for a categorical exclusion under
> HFRA.

*Id.* (internal quotation marks omitted).

We reject the Forest Service's argument as well. What constitutes a wildland-urban interface is specifically defined by HFRA: in pertinent part, it is "an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary in a community wildfire protection plan." 16 U.S.C. § 6511(16)(A). HFRA further defines "at-risk community" as an area "that is comprised of" "an interface community" as defined by federal regulation, or "a group of homes and other structures with basic infrastructure and services . . . within or adjacent to Federal land." *Id.* § 6511(1)(A)(i), (ii). Thus, under HFRA, a wildland-urban interface's boundaries are tethered to the location of at-risk communities, which are themselves defined with technical detail.

The Bonner County community plan, by contrast, has a broader definition unmoored from the specifics of HFRA: "[A]n area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence. Location: It is found in remote scattered development areas to highly developed urban areas and everywhere in between." This definition is followed by a "[r]ationale for designating the wildland-

urban interface," which discusses historical trends for fire events and best practices for reducing fire risk.

Notably absent from the Bonner County community plan, however, is any discussion of the HFRA definition of wildland-urban interface or "at-risk communities."  Nor is there any discussion of interface communities or the relative location of federal lands—i.e., the metrics for determining at-risk communities under HFRA.  Untethered from HFRA's more limited definitions, the Bonner County community plan's broader definition may well sweep in more land than its HFRA counterpart.

Put simply, the Forest Service seeks to justify invoking the categorical exclusion solely because the Project fell within the wildland-urban interface designated by the Bonner County community plan.  But the community plan's definition of its wildland-urban interface—on its face—deviates from HFRA and likely results in a covered area beyond what Congress authorized.  Thus, in this case, the Forest Service cannot properly rely on the Bonner County community plan—alone—to justify the categorical exclusion. This is not to say that the Forest Service can never rely on a community plan's definition of the wildland-urban interface or that a community plan's definition must simply parrot HFRA's.  Community plans may well inform the Forest Service's analysis under HFRA.  But reliance on a plainly overinclusive wildland-urban interface, without more, is the sort of "clear error of judgment" that arbitrary or capricious review is meant to prevent. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 385 (1989); *see Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("[A]gency action is lawful only if it rests on a consideration of the relevant factors." (internal quotation marks and citation omitted)).

We thus conclude that the Project's location within the Bonner County community plan's asserted wildland-urban interface is not enough by itself to justify use of HFRA's categorical exclusion.

3

The Forest Service also argues that new information provided in the Supplement shows that the Project is, in fact, within the wildland-urban interface as defined by HFRA. In particular, the Supplement contains a map showing the Project positioned near the Lamb Creek and Nordman communities. The Supplement also highlights that historical trends show communities in Bonner County are at the "greatest risk from wildfire." Thus, the Forest Service argues that the record shows the Project falls within "an area within or adjacent to an at-risk community" and therefore, falls within HFRA's definition of the wildland-urban interface. 16 U.S.C. § 6511(16)(A).

The district court disagreed. It concluded that serious questions existed about whether Nordman and Lamb Creek qualified as an "at-risk community," which is defined as "a group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land." *Hanna Flats II*, 550 F. Supp. 3d at 903 (quoting 16 U.S.C. § 6511(1)(A)(ii)).

Drawing from § 6511(1)(A), the district court stated that "under the plain language of HFRA . . . the at-risk community must be 'within or adjacent to,' i.e., border or 'abut,' the Federal land at issue, *i.e., the Project area*." *Id.* at 904 (emphasis added). There is no dispute that "neither Nordman nor Lamb Creek border the Project area." *Id.* at 903–04 ("[T]he communities identified in the Supplemental

Memo—Nordman and Lamb Creek—are three miles away and one mile away, respectively, from the Project area."). Thus, the district court concluded that those communities did not qualify as "at-risk communities" under § 6511(1)(A) and therefore did not support the "determination that the Project area is entirely located within the wildland-urban interface." *Id.* at 904.

On appeal, the Forest Service contends that the district court's reading of HFRA—which requires a community to border or abut the project area to qualify as an "at-risk community"—is incorrect. In particular, the Forest Service challenges the district court's substitution of the words "the Project area" for the statutory text "Federal land."

a

The district court erred in its interpretation. In fairness, HFRA is not a model of clarity and contains several interrelated provisions. But a careful reading of the unambiguous text shows that a project is subject to the categorical exclusion when it is "in the wildland-urban interface." 16 U.S.C. § 6591b(c)(2)(A) ("A project under this section shall be limited to areas . . . in the wildland-urban interface . . . ."). An "area" qualifies as "wildland-urban interface" if it is "within or adjacent to an at-risk community." *Id.* § 6511(16)(A). And a community is "at risk" if it is "within or adjacent to Federal land." *Id.* § 6511(1)(A)(ii).

In summary, the project must fall within an area (the wildland-urban interface) that is within or adjacent to an at-risk community. An at-risk community must be within or adjacent to federal land. But the district court's interpretation collapses these distinct provisions into a rule that the project itself must border the at-risk community. For

the district court, "Federal land" must be the federal land at issue in the case (which would be the Project land here). Under the district court's interpretation, even if a project falls within a properly defined wildland-urban interface, the project is not valid unless it also directly borders or abuts an at-risk community. Yet nothing in the statutory language supports this limitation.

The district court justified its "border or abut" rule by noting "the distinction made by HFRA between an area that has a community wildfire protection plan and an area that does not have a community wildfire protection plan." *Hanna Flats II*, 550 F. Supp. 3d at 904. Where, as here, there is a community wildfire protection plan in place, the wildland-urban interface is defined as an area "within or adjacent to an at-risk community." 16 U.S.C. § 6511(16)(A). By contrast, for an area where the community has not adopted such a plan, the wildland-urban interface is defined as an area either 0.5 miles or 1.5 miles from the boundary of an at-risk community, depending on geographic and other characteristics. *See id.* § 6511(16)(B)(i), (ii).

Thus, HFRA provides communities without plans a baseline level of protection but imposes a specific wildland-urban interface boundary of either 0.5 miles or 1.5 miles away, depending on various factors. *Id.* § 6511(16)(B). But HFRA also allows communities to adopt a community wildfire protection plan that "identifies and prioritizes areas for hazardous fuel reduction treatments." *Id.* § 6511(3)(B). HFRA "gives priority" to projects "that implement community wildfire protection plans," *id.* § 6513(a), and ensures that funding allocations "give priority to communities that have adopted a community wildfire protection plan," *id.* § 6513(d)(2)(B). And for communities with such a plan, the wildland-urban interface is defined in

more flexible terms: "an area within or adjacent to an at-risk community that is identified . . . in a community wildfire protection plan." *Id.* § 6511(16)(A).

In sum, the statutory scheme creates a baseline protection of at least 0.5 or 1.5 miles around at-risk communities. But the statutory scheme permits communities with plans to identify wildland-urban interfaces that extend beyond those strict limitations to meet their communities' needs. Thus, while we agree with the district court that the statutory scheme treats communities with and without community plans differently, we conclude that the statutory scheme gives communities with plans more—not less—flexibility. This makes sense, because the increased flexibility gives communities an incentive to develop a community plan. The district court's rule that a project must border or abut an at-risk community flips HFRA's scheme on its head. Under that rule, communities that adopt plans would enjoy HFRA's protections only for projects right next to the at-risk community, significantly limiting their choice to "identif[y]" wildland-urban interfaces in their community plans. *Id.* § 6511(16)(A). HFRA prioritizes communities with plans and allows them a more flexible standard for defining the wildland-urban interface. Therefore, the district court's interpretation is belied by HFRA's statutory language.

b

In issuing the injunction, the district court applied the less-stringent "serious questions" standard instead of the typical "likelihood of success of the merits" inquiry. *Hanna Flats II*, 550 F. Supp. 3d at 898. But that does not alter our analysis. In the context of injunctive relief, "serious questions" refer to "questions that 'cannot be resolved one

way or the other at the hearing on the injunction' because they require 'more deliberative investigation.'" *Manrique v. Kolc*, --- F.4th ---, No. 22-15705, 2023 WL 3036993, at \*3 (9th Cir. 2023) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)). Though this standard is less demanding, it does not erase the Supreme Court's admonition that an injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Accordingly, a "serious question" does not exist where the plaintiff's claim is "merely plausible" or just because there are legal questions not directly answered by past precedent. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022) (instructing that "the district court must analyze the merits" and cannot "forgo legal analysis just because it has not identified precedent that places the question beyond debate").

Here, the district court found a "serious question" about the validity of the categorical exclusion due to an incorrect interpretation of a statute—a pure error of law. But like many legal questions, the meaning of HFRA's unambiguous provisions would not become clearer with "at least some discovery" or a "further hearing on the merits." *Cottrell*, 632 F.3d at 1131 (citation omitted). There is no need for more deliberative investigation or development of the record to resolve the plain meaning of HFRA.

We therefore conclude that the district court relied on a misinterpretation of HFRA in concluding that serious questions existed going to the merits.[7] Because a legal error

---

[7] We do not decide whether Nordman or Lamb Creek (or anywhere else) qualify as "at-risk communities" for purposes of HFRA's categorical

infected this "'threshold inquiry,' we need not consider the other factors" governing injunctive relief. *See California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (citation omitted).

c

Finally, Alliance argues that, even if the district court erred in issuing the preliminary injunction, we should leave it in place while the district court reconsiders whether there are sufficient serious questions on remand. The district court never addressed Alliance's alternative theory for a preliminary injunction: that the Project violates limitations on roads in certain areas designated for bear protection called Bears Outside Recovery Zones (BORZ).

It is counterintuitive to keep a preliminary injunction in place after concluding the district court abused its discretion in issuing it. Typically, a trial court's decision about a preliminary injunction is properly "set aside when it is based on . . . improper legal premises." *Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 515 (9th Cir. 1984). After all, a preliminary injunction is an "extraordinary remedy never awarded as of right" or without a "clear showing" of entitlement; absent that, such relief should not issue. *Winter*, 555 U.S. at 22, 24. Yet on a handful of occasions, we have retained an injunction granted on improper legal bases, though under unique circumstances.

For example, in *Gerling Global Reinsurance Corp. of America v. Low*, 240 F.3d 739, 754 (9th Cir. 2001), we held that the district court erred in finding that a statute violated the dormant Commerce Clause and the foreign affairs power, yet still left the preliminary injunction in place to

---

exclusion. That question can be addressed on remand under proper legal and statutory standards.

give the district court an opportunity to consider an unaddressed argument that the statute also violated the Due Process Clause.  But the defendant "acknowledged at oral argument" that there was a "serious question" about the validity of a statute under that alternative ground, and there was no dispute that plaintiffs would suffer irreparable harm if the statute took effect.  *Id.* at 754 & n.11.  And in *United States v. Hovsepian*, 359 F.3d 1144, 1157 (9th Cir. 2004) (en banc), we held that a district court erred in entering an injunction preventing the government from deporting someone.  We also left the "the injunction in place . . . . pending the conclusion of all proceedings in this case, in aid of the court's jurisdiction."  *Id.*

This is not a case, however, where Alliance's alternative BORZ argument (which is discussed fairly briefly on appeal) clearly has merit.  Unlike in *Gerling*, the Forest Service claims this alternative argument is meritless.  And unlike in *Hovsepian*, nothing suggests that retaining the injunction is needed to protect our jurisdiction.  Alliance makes no argument that irreparable harm or mootness issues will arise before it can renew its request for a preliminary injunction on these alternative grounds.  Ultimately, whether to issue a preliminary injunction—or, in this case, retain one—"is an exercise of discretion and judgment."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  And here, there is no reason to conclude that we should exercise our equitable discretion to leave an injunction in place that was wrongly granted, and where no likelihood of success on another claim is clear.

Because the preliminary injunction was based on a legal error, we vacate it.

## VI

For these reasons, the district court's grant of summary judgment in *Hanna Flats I* is **VACATED** and the district court's preliminary injunction in *Hanna Flats II* is **VACATED**.  We **REMAND** both matters for proceedings consistent with this opinion.[8]

---

[8] We **DENY** Alliance's opposed request for judicial notice of a timber sale cancellation letter.  Even assuming this letter is judicially noticeable, it is not "relevant to any issue on appeal." *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 393 n.7 (9th Cir. 2000).  We also **DENY** Alliance's request to strike portions of the Forest Service's briefing that cite internet sources.  We permit "undisputed facts offered only for general background" to be offered without a citation to the excerpts of record. 9th Cir. R. 28-2.8.